IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

```
BOARD OF REGENTS OF THE          )
UNIVERSITY OF NEBRASKA,          )
                                 )
               Plaintiff,        )          4:04 CV 3356
                                 )
        v.                       )
                                 )
                                 )
BASF CORPORATION,                )          MEMORANDUM AND ORDER
                                 )
               Defendant.        )
```

Defendant has filed a motion to compel the production of four
categories of documents withheld from discovery by the plaintiff.
Voluminous materials have been filed both in support of and in
opposition to the motion, all of which I have reviewed.  In
addition, the parties have now clarified the motion by setting out
the specific responses and documents intended to be addressed.  I
conclude the motion should be granted in part and denied in part,
as discussed below.

In 1993 the plaintiff ("University") contracted with Sandoz
Agro, Inc. ("Sandoz") for the funding of research by Dr. Donald
Weeks, a microbiology professor at the University, to identify and
isolate a gene which could be expressed by soybean plants and
thereby make them resistant to dicamba, a chemical herbicide.  The
term of the contract was two years, renewable by the parties.  The
contractual relationship with Sandoz was extended in 1995 and
expired in March, 1997.  The contract gave the University title to
"know-how, inventions, and where appropriate, resulting patents"
developed solely by the University.  It gave Sandoz title to "know-
how, inventions, and where appropriate, resulting patents"
developed solely by Sandoz.  It gave the title of "know-how,
inventions, and resulting patents" developed jointly to both the

University and Sandoz.  It also gave Sandoz a non-exclusive license
to market any marketable product that might come from the research.
Filing 39, Exhibit A, Para. 10.

In October, 1997 the University contracted with United Agro
Products, Inc. ("UAP") for continued funding in place of Sandoz,
under similar but not identical arrangements, that is, UAP funded
the research but was given an exclusive license to market any
resulting products.  This relationship continued until 2004 when
UAP considered terminating its research and license agreement with
the University.  The University then contacted other industry
corporations to explore continued funding of the research and an
exclusive license for any products.  One of the companies
approached was the defendant, BASF.

BASF had purchased Sandoz in December, 1996.  Filing 39,
Exhibit J.  As part of that transaction, BASF also purchased
Sandoz's rights "to Dicamba and Dicamba-based Products in the
United States and Canada and patents related thereto...."  Id.
Exhibit J, Appendix 2.01.  When discussions occurred between the
University and BASF in 1997, BASF asserted it held a non-exclusive
license to market any resulting marketable products developed in or
from the research of Dr. Weeks, since it had assumed the position
of Sandoz in the sale.

UAP was reportedly concerned that it did not have an exclusive
license to sell to a successor in interest, and requested the
University's clarification.  In response, the University obtained
the legal opinions of two Lincoln law firms, and, at UAP's request,
disclosed one of those opinions to UAP.  Both firms' conclusions
were that BASF's position was not valid.  Declaration of Kevin
Howard, Filing 46, Exhibit 2.  Thereafter UAP sold its interests
under its contract with the University to Monsanto.  Id.

In time the research of Dr. Weeks and his associates at the University bore fruit.  A gene was identified and determined to be usable in developing a dicamba-resistant soybean plant.  The University and Dr. Weeks applied for several patents of intellectual property developed from the research, and one of those applications has been successful.  Declaration of Donald Weeks, Filing 46, Exhibit 1.

University has now filed this action seeking a declaratory judgment "that BASF has no right, title or interest in the License."  Filing 1, Page 4.  BASF has counterclaimed, alleging it has a right to intellectual property developed during the existence of Sandoz's funding arrangement with the University, including the patent, and that through Sandoz, it obtained a valid, non-exclusive license.  BASF seeks such a declaration and an injunction against the University prohibiting it from taking any actions inconsistent with BASF's claim.  Filing 30, Exhibit 1, Page 10.

BASF's discovery appears aimed at determining exactly what intellectual property the plaintiff is seeking to protect, that is, what intellectual property was developed during the time that Sandoz was funding the research.  University has raised a number of objections to providing the information, documents and things requested, including attorney-client privilege, relevancy, burden, and proprietary information.  I shall discuss those more fully in reference to the particular categories of documents sought by the motion.  Before addressing those, however, some general comments are in order.

First, plaintiff has objected to nearly all of the inter-rogatories propounded by defendant, and then provided answers to them over the objections.  This practice has long been held to waive the objections unless privileges protect the answering party's position.  See, e.g., <u>Meese v. Eaton Mfg. Co.</u>, 35 F.R.D.

162, 166 (N.D. Ohio, 1964).  At the outset of its responses, the
plaintiff raised several boilerplate objections "to the extent
that" the defendant's discovery requests sought attorney-client
privileged information, work product, or proprietary information,
were vague, overbroad, burdensome, oppressive, irrelevant, or
purported to place a burden on the defendants that is not imposed
by the discovery rules.  Filing 40, Exhibit 3.

These objections, which the plaintiff labels "general
objections," are not sufficient under the federal rules.  "It has
long been recognized in the cases that objections should be
specific and be supported by a detailed explanation of why an
interrogatory or class of interrogatories is objectionable."  8A
Wright, Miller & Marcus, Federal Practice and Procedure § 2173 (2d
1994).  To raise a successful objection to defendant's discovery
requests, the responder cannot simply recite the familiar litany
that the discovery requests are overbroad, unduly burdensome,
oppressive, vague, and seek privileged or irrelevant information or
information protected as work product.  The burden has always
fallen upon the party resisting discovery to clarify and explain
its objections and to provide support therefor.  Roesberg v.
Johns-Manville Corp., 85 F.R.D. 292, 296-97 (D.C. Pa. 1980).

However, prior to the 1993 amendments to the Federal Rules of
Civil Procedure, a party objecting to an interrogatory was relieved
of the duty to answer the interrogatory until the objection was
resolved by the court, even if the objection went to only a portion
of the interrogatory.  See, Wright, Miller and Marcus, Federal
Practice and Procedure, Civil 2d, §2173.  Thus, the burden of
bringing the matter to the court was on the interrogating party,
and once the objection was ruled upon, if overruled, the responder
was given additional time in which to serve its answer.  See Rule
37.  This practice resulted in delay in the best circumstances, and

obfuscatory objections in the worst, even though the courts placed the burden on the objecting party to state any objections with specificity, and, once a motion to compel was filed, to prove the correctness of the objection.  Id.  Also under prior longstanding law, if an answering party both objected to and answered an interrogatory, the objection was held waived.  See, e.g., Meese v. Eaton Mfg. Co., supra.

In the 1993 amendments to Rule 33 the Advisory Committee opined that the responding party should be required to identify that specific portion of the interrogatory to which objection was made, and answer the rest.  Advisory Committee comments to 1993 Amendments to Rule 33, 28 U.S.C. fol. Fed. R. Civ. P. 33.  The amendment, adding paragraph (b)(4), embodied this aim.  No further explanation by the Committee appears in the notes, nor in the report to the Committee on Rules of Practice when it was communicated for adoption, 146 F.R.D. 53, 124-125 (1991).  In fact, the committee's comments on this particular amendment remained the same throughout the rule-making process.

Thus, although there is no explicit statement of the committee's aim in altering the rule in this respect, the effects of the change should be clear.  When the responder's objection pertains to only a portion of the interrogatory, the discovering party is entitled to all information responsive to the remainder of the interrogatory without the delay caused by resolution of an objection.  In addition, the amendment causes both parties to focus on the particular portion of the interrogatory over which they are in disagreement.  This, in turn, moves discovery forward without involving the court, an objective clearly apparent in the 1993 amendments as a whole, while also hopefully assisting the parties in expeditiously resolving the objection and determining whether a motion to compel should be filed.

Nothing in the 1993 amendments relieved the responding party
of its obligation to state its objections with particularity; to
the contrary, the committee made this requirement explicit by
inserting new paragraph (b)(4).  Nor did the amendments relieve the
responder from the "waiver" consequence when "answering over" its
objection.

If a responder objects generally without identifying the
specific portion of the interrogatory to which objection is made,
the interrogator is justified in inferring that the responder is
following the rule, and that, therefore, in the absence of such an
identification, the objection goes to the entire interrogatory.  If
the objector then goes forward and provides "some" information
responsive to the interrogatory, the serving party is left without
any basis to judge whether the response is a "complete" response to
"all" of the interrogatory, a "complete" response to a "portion" of
the interrogatory, an "incomplete" response to "all" of the
interrogatory, or an "incomplete" response to a "portion" of the
interrogatory.  When the responder has provided "some" (most likely
favorable or neutral) information, the serving party legitimately
must wonder whether the responder is holding back "some" (less
favorable) information.  Such an ambiguous response thwarts the
purpose of the rule:  To provide the discovering party a specific
objection to an identified portion of the interrogatory and ALL
information responsive to the remainder.

The plaintiff's "general objections" are therefore
insufficient and cannot be sustained.  The plaintiff's "answering
over" its objections leaves all of such answers ambiguous, at best.
In this case plaintiff did, however, provide a privilege log in
support of its attorney-client and work product privilege
objections, and also asserted some slightly more specific
objections with regard to specific discovery requests, and, in

addition, filed evidence supporting its objections after the motion
was filed.  Although not overcoming the general objections and the
failures to identify the particular portions of the requests to
which objection is made, these are of at least some assistance.  In
considering the motion, I have attempted to divine the true nature
of plaintiff's objections and the specific documents to which they
refer; where I have been unable to do so, however, the objections
are overruled.

     Second, the plaintiff's implicit argument, as shown in its
responses to the discovery requests, as well as its communications
to the defendant regarding these disputes, that the defendant must
demonstrate some evidentiary basis for defendant's defenses and
counterclaims before they become "relevant" for discovery purposes,
is not well taken.  The scope of "relevance" under the rules is
defined in Fed. R. Civ. P. 26(b)(1) as "any matter, not privileged,
that is relevant to the claim or defense of any party...."
Defendant's discovery requests are relevant if they pertain to any
claim or defense within the scope of the pleadings.  Plaintiff's
arguments to the contrary are simply wrong.

     If the defendant does not have any factual basis for its
pleadings, that raises separate issues under Rule 11, but it does
not allow the plaintiff to unilaterally determine the permissible
scope of defendant's discovery.  In discovery, the defendant is
entitled to non-privileged information in the hands of its opponent
without any requirement to demonstrate any factual basis for its
pleadings whatsoever.

**1.   Laboratory notebooks and other documents showing what intellectual property was developed under the contract between the plaintiff and Sandoz Agro, Inc., how that intellectual property was developed, and who was involved in that development.**[1]

Requests for Production Numbers 1, 8, and 22.   The principal items in issue by this portion of the motion are two sets of laboratory notebooks created by Dr. Weeks and his associates and assistants in performing the research over the course of the project.   The university objected to this request on the basis of attorney-client privilege, work product, irrelevance, proprietary information, and undue burden and expense.

As indicated earlier, I must overrule all the objections that are not supported with an evidentiary showing.   There is no evidence that these notebooks were created at the direction or request of counsel in anticipation of litigation, so they are not protected work product.   Likewise there is no showing that they are confidential communications to or from an attorney in the course of providing legal advice, so the attorney-client privilege does not apply. See, <u>Greenwalt v. Wal-Mart Stores, Inc.</u>, 253 Neb. 32 (1997). Because the actions of Dr. Weeks and his staff during the time the project was funded by Sandoz may disclose whether any "joint" efforts were undertaken with Sandoz personnel, the documents created during the duration of the contractual relationship with Sandoz are clearly relevant to the issues raised in the pleadings.

---

[1] This particular designation is not found explicitly in the defendant's requests for discovery; rather, it is a combination of several specific requests propounded by defendant, in violation of local rules.  See NECivR 7.1(i)(2).  In response to the court's directive, however, the parties have specified this is intended to refer to documents disclosed in response to the defendant's Requests for Production Numbers 1, 8, and 22, and Interrogatory No. 2.  Defendant's Supplemental Motion to Compel, filing 50.

Regarding burden and expense, the university has produced
evidence to the effect that these documents have been stored in Dr.
Weeks's office and together number approximately 18,000 pages.
Declaration of Donald Weeks, Filing 46, Exhibit 1.  Defendant's
counsel have offered to examine them without the need for copies,
and by offering to bear the related expenses, dispute the argument
that producing them would be costly or burdensome to the
university.  Reply Brief of Defendant, Filing 47, Page 8.
Accordingly, the university has failed to show that an order
directing it to produce the documents would be overly expensive or
burdensome.

Finally, the university claims the documents are
"proprietary," by which it presumably means confidential trade or
commercial information or trade secrets.  The evidence on this
claim is sparse. It consists of (1) the declaration of Dr. Weeks
(Filing 46, Exhibit 1, Para. 21); (2) the contract between
plaintiff and Sandoz (Filing 40, Exhibit A, Para. 6); (3) the
confidentiality provisions in the contract between plaintiff and
UAP (Filing 46, Exhibit 2, Attachment A, Para. 11); and (4) the
fact that at least one of the applications for patents has been
granted (Filing 46, Exhibit 1, Para. 14-16).

The Weeks affidavit states simply, "My research assistants and
I have maintained the confidentiality of our written laboratory
records described in paragraphs 17 through 19, above.  We have not
shown those records to anyone other than employees of the
University, the corporate sponsors of our research, and the
University's attorneys in this case."  There is no evidence before
the court indicating that the materials have ever *not* been regarded
as confidential, but there is also no evidence of their being
locked away or in any way actually protected from prying eyes or
industrial spying.  The descriptions of the materials comport with

the notion that they would normally be regarded as at least potentially proprietary, and confidentiality would be expected.

Under Nebraska law information "which if released would give advantage to business competitors and serve no public purpose" is confidential and not the proper subject of discovery.  Burlington Northern R. Co. v. Omaha Public Power Dist., 703 F. Supp. 826, 831 (D. Neb. 1988) aff'd, 888 F.2d 1228 (8th Cir 1989).  In Burlington, this court found that a trade secret (1) may consist of "formula, pattern, device or compilation of information used in one's business, and which gives him an opportunity to obtain advantage over competitors who do not know or use it;" (2) must be "for continuous use in operation of the business;" (3) may "relate to sale of goods or other operations in the business, and (4) must be secret and not generally known to the public or the industry.  Further, to assess the existence of a trade secret, the court considers "the efforts of the owner to keep the information secret and its competitive value if disclosed").  Id. at 831 (citing Restatement of Torts, § 757, comment b).  While the information sought here does not well "fit" the definition above because there is no "business" involved, it appears to match the other criteria.  That is, it appears in the context of this case to be information that could develop into trade secrets.  It must, therefore, be treated as confidential commercial information in determining whether it should be disclosed.

> It is well settled that there is no absolute privilege for trade secrets and similar confidential information; the protection afforded is that if the information sought is shown to be relevant and necessary, proper safeguards will attend disclosure.  It is for the party resisting discovery to establish, in the first instance, that the information sought is within this provision of the rule and that he might be harmed by its disclosure....

10

If it is established that confidential information is
being sought, the burden is on the party seeking
discovery to establish that the information is
sufficiently relevant and necessary to his case to
outweigh the harm disclosure would cause to the person
from whom he is seeking the information.  The matter was
well put by the Advisory Committee on Rules of Evidence:
"The need for accommodation between protecting trade
secrets, on the one hand, and eliciting facts required
for full and fair presentation of a case, on the other
hand, is apparent.  Whether disclosure should be required
depends upon a weighing of the competing interests
involved against the background of the total situation,
including consideration of such factors as the dangers of
abuse, good faith, adequacy of protective measures, and
the availability of other means of proof."  8 Wright &
Miller, Federal Practice and Procedure: Civil § 2043, pp.
300-302 (1970).

Application of Northwestern Bell Telephone Co., Omaha, 223 Neb.
415, 419-420 (1986).  See also, In re Remington Arms Co., Inc., 952
F.2d 1029, 1032 (8th Cir. 1991) (Under Fed. R. Civ. P. 26(c)(7),
party opposing discovery has initial burden of showing information
sought is "trade secret or other confidential research, development
or commercial information" the disclosure of which would cause it
harm; burden then shifts to party seeking discovery to show
relevance to the case and that disclosure is necessary for it to
prepare for trial).

In Burlington Northern the Nebraska Public Power District
(NPPD) sought disclosure of a coal transportation contract between
the Omaha Public Power District and Burlington Northern.  After
review of the contract in camera as well as additional supporting
evidence submitted by Burlington Northern in opposition to this
disclosure, the court noted that the confidential pricing
information had been developed at considerable expense, the
information was for continuous use in business rather than a
one-time event, the information was not generally known to the
public, and Burlington Northern had gone to considerable lengths to

11

keep the information secret.  The contract was the subject of a
strict confidentiality clause.  Under these facts the court held
that Burlington Northern had met its burden of proving by the
greater weight of the evidence that the contract was a trade
secret.  Id. at 831.

    In contrast, the university has not met its burden of proving
that the information in Dr. Weeks's notebooks is confidential
proprietary information.  Other than by the vaguest of
descriptions, it is impossible from the evidence to determine
exactly what the materials contain.  Further, there is no evidence
of how the disclosure of the information in them would damage him
or the university; in fact, the evidence undermines such a
conclusion.  Nov. 8, 2004 letter from Prem Paul to Mr. Greg Fujan,
Filing 40, Exhibit O.[2]  The court can speculate that the notebooks
contain important scientific information in a continuing line of
experiments which, according to the affidavit, "ultimately"[3]
resulted in favorable findings; speculation, however, is not
evidence.  The failure to "identify the trade secrets with
sufficient specificity renders the court powerless to enforce any
trade secret claim."  Porous Media Corp. v. Midland Brake Inc., 187
F.R.D. 598, 600 (D. Minn.1999).  There is no specific indication of
when each document was created or why or by whom, nor how it might
relate to any later-developed gene or product, nor why it should be

---

    [2] The letter states that the UAP has sought marketing proposals
from all the "major players, and only one has expressed serious
interest in it, possibly because any such organization would have to
expend approximately $50 million and eight to ten years to get it on
the market, assuming approval could be obtained from appropriate
federal government agencies in this and other countries, leaving only
approximately four years to reap profits from it before the patents
expire.

    [3] Nothing in the evidence before the court defines when
"ultimately" was.  Thus, it is unknown whether any of the experiments
conducted during the Sandoz contract were in any way related to the
"ultimate" outcome of all the research.

regarded as confidential.  The affidavit of Dr. Weeks does not
refer to any measures taken by him or by the university to preserve
confidentiality of the lab notebooks and records, nor to any
agreements signed by him and/or his research assistants requiring
confidentiality.  While it is true that Dr. Weeks regarded the
materials as confidential, as apparently did the university, at
least to some degree, that fact does not establish any requirement
that the materials be kept confidential.  I therefore conclude that
the university has failed to meet its burden to demonstrate that
these materials are confidential proprietary information.

      That does not end the inquiry, however, because plaintiff also
challenges the relevance of these materials to the dispute before
the court.  As indicated above, I think the allegations in
defendant's pleadings make the documents prepared or created during
the time of the contractual relationship between plaintiff and
Sandoz relevant for discovery purposes, and I shall direct their
production.  Defendant has not, however, established how any
documents or things created before the contract's creation or after
its termination are relevant to any issue raised by the pleadings
in this case.  I shall deny defendant's motion to that extent.

**2.  Prosecution history documents relating to the Board's pending
patent applications and issued patents (if any).**[4]

      Defendant argues that these documents may "affect the scope of
the intellectual property that the Board says its declaratory
judgment claim raises."  Filing 38, page 2.  If these discovery
requests are seeking identification of the exact material,
technology, and/or products at issue in the plaintiff's prayer for
relief, there would be other more direct means to obtain such an

---

      [4] The parties agree that this is material sought by Interrogatory
2 and Request for Production 1.

itemization.  The prosecution history of the patent applications might also contain at least some of such information, but not necessarily all of it.  While defining the "scope" of the documents, "know-how," or products sought to be declared the plaintiff's intellectual property is certainly a material issue in the case, I fail to see how the prosecution history of the patent applications is necessarily relevant to that issue.  I shall deny the motion in this respect.

**3.  Unspecified documents that the Board has withheld as "proprietary."[5]**

I have previously addressed this argument with regard to category 1 documents above.  The same reasoning applies to these unspecified documents.  The motion will be granted in this respect as to all such documents prepared or created during the existence of the contract with Sandoz.

**4.  Opinions of counsel examining BASF's claim that it acquired Sandoz Agro's license rights under the Contract.[6]**

Rule 501 of the Federal Rules of Evidence states:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Evid. 501.  In this action the substantive laws of the state of Nebraska apply.  Thus, Nebraska law governs the question

---

[5] The parties apparently agree that this is a compilation from defendant's Interrogatories 2, 4, and 9, and Requests for Production 1, 2, 4, 7, 12-13, 15-17, and 19.

[6] The parties apparently agree that this refers to Requests for Production 7, 8, and 22.

of attorney-client privilege.  Neb. Rev. Stat. § 27-503(2)
provides:

> A client has a privilege to refuse to
> disclose and to prevent any other person from
> disclosing confidential communications made for
> the purpose of facilitating the rendition of
> professional legal services to the client (a)
> between himself or his representative and his
> lawyer or his lawyer's representative, or (b)
> between his lawyer and the lawyer's repre-
> sentative, or (c) by him or his lawyer to a
> lawyer representing another in a matter of
> common interest, or (d) between representatives
> of the client or between the client and a
> representative of the client, or (e) between
> lawyers representing the client.

Neb. Rev. Stat. § 27-503(2).

       The party asserting a privilege has the burden of proving its
existence.  Rayman v. American Charter Federal Savings & Loan
Ass'n, 148 F.R.D. 647, 653 (D. Neb. 1993); McFadden v. Norton Co.,
118 F.R.D. 625, 627 (D. Neb.1988), citing FTC v. Shaffner, 626 F.2d
32, 37 (7th Cir. 1980); Heathman v. United States District Court,
503 F.2d 1032, 1033 (9th Cir.1974); Robinson v. Magovern, 83 F.R.D.
79, 85 (W. D. Pa. 1979); Pleasant Hill Bank v. United States, 58
F.R.D. 97, 101 (W. D. Mo. 1973).

       The principal issue before me on this category of documents is
whether the university and UAP had a "common interest" in the sale
of UAP's exclusive license to a third party, Monsanto, and if so,
whether the university's giving their counsel's opinion letter to
UAP waived the attorney-client privilege.  The evidence before the
court clearly establishes that the opinion letter in question is a
confidential communication between attorney and client relating to
a legal matter.  It clearly is subject to the attorney-client
privilege.  At the time the letter was provided to UAP the
university required that UAP agree in a detailed writing to keep it

private and not disclose it.  Declaration of Kelvin Howard, Filing
46, Exhibit 2 B.

    The disclosure of the letter to UAP under strict, written
agreement to preserve confidentiality, did not destroy or waive the
attorney-client privilege under the circumstances here.  Both the
plaintiff and UAP were seeking assurance that UAP's exclusive
license agreement could be sold without creating liability to BASF.
The opinion disclosed was apparently to that effect, and thus
permitted the sale to take place, transferring such license to
Monsanto.  Even though UAP and the university were dealing with
each other in an "arms-length" transaction of negotiating UAP's
sale of the exclusive license, both were desirous of completing the
transfer and both were interested in doing so without incurring
liability to BASF; i.e. their interests were aligned vis a vis BASF
and Monsanto.  Compare Rayman, supra (Disclosure of attorney-client
privileged documents between merging companies did not waive the
privilege), and Hewlett-Packard Co. v. Bausch & Lomb Inc., 115
F.R.D. 308, 309 (N.D. Cal. 1987) (Disclosure of attorney-client
privileged documents concerning a possible patent infringement
claim to prospective buyer of corporation did not waive privilege).
I conclude UAP and the plaintiff had a "common interest" as
required under the statute.  Disclosing the opinion did not waive
the privilege.

    BASF also argues that disclosure of the conclusions of the
opinion letter to it waived the privilege.  In a November 11, 2004
letter from Kannon Grant, Vice Chancellor of the university, to Dr.
Marty Mascianica at BASF, Filing 40, Exhibit N, is the following
statement:  "We must inform you that our attorneys have reviewed
the materials you provided to us, have reviewed the file and do not
believe that your claim to a nonexclusive license is valid."  BASF
claims that that statement of conclusions entitles it to all of the

16

communications between plaintiff and its counsel, requiring
disclosure of the opinion letter(s) to it.  I disagree.

     In construing the attorney-client privilege and claims of its
waiver in various circumstances, the Nebraska Supreme Court
established the parameters of claims of waiver in <u>League v. Vanice</u>,
221 Neb. 34 (1985).  As summarized in a later case,

> <u>League</u> involved a suit by a minority shareholder against
> a corporate president alleging that the president had
> breached a duty to the plaintiff with respect to various
> corporate transactions.  To avoid the bar of the statute
> of limitations, the plaintiff alleged, inter alia, that
> the president had concealed certain facts, thus putting
> the plaintiff's knowledge of such facts in issue.  Over
> objection, the plaintiff's attorney was permitted to
> testify regarding conversations he had had with the
> plaintiff regarding the allegedly concealed facts.  We
> stated in <u>League</u> that a party "is not permitted to thrust
> his lack of knowledge into the litigation as a foundation
> or condition necessary to sustain his claim ... while
> simultaneously retaining the lawyer-client privilege to
> frustrate proof of knowledge negating the very foundation
> or condition necessary to prevail on the claim."  221
> Neb. at 45.
>
> * * *
>
>     "Fairness is an important and fundamental consider-
> ation in assessing the issue of whether there has been a
> waiver of the lawyer-client privilege." 221 Neb. at 44.
> We further noted that in cases where an exception to the
> privilege existed,
> > " 'in each instance, the party asserting the
> > privilege placed information protected by it in
> > issue through some affirmative act for his own
> > benefit, and to allow the privilege to protect
> > against disclosure of such information would
> > have been manifestly unfair to the opposing
> > party.  The factors common to each exception
> > may be summarized as follows:  (1) assertion of
> > the privilege was a result of some affirmative
> > act, such as filing suit, by the asserting
> > party; (2) through this affirmative act, the
> > asserting party put the protected information

17

at issue by making it relevant to the case; and
(3) application of the privilege would have
denied the opposing party access to information
vital to his defense.  Thus, where these three
conditions exist, a court should find that the
party asserting a privilege has impliedly
waived it through his own affirmative
conduct.'" Id. (quoting Connell v.
Bernstein-Macaulay, Inc., 407 F. Supp. 420 (S.
D. N. Y. 1976), citing and quoting Hearn v.
Rhay, 68 F. R. D. 574 (E. D. Wash. 1975)).

State v. Roeder, 262 Neb. 951, 957-958 (2001) (criminal defendant's

putting her lawyer's advice at issue in a motion to withdraw guilty

plea waived the privilege).  See also, Unland v. City of Lincoln,

247 Neb. 837, 844 (1995).


The substance of counsel's advice to plaintiff was not an

issue when the letter was written, nor is it an issue in this case.

Nor has plaintiff made it an issue by pleading some reliance on it

as a defense to the counterclaims of BASF.  The disclosure of the

bare conclusion of counsel was not a statement of a confidential

communication such as to make the bases of counsel's advice

necessary for BASF to prove its defenses or counterclaims in this

case.  I conclude that the disclosure of only counsel's conclusion

did not waive the attorney-client privilege.


Reviewing the plaintiff's "Revised Privilege Log," Filing 46,

Exhibit 4 B, the descriptions of the documents withheld are not

sufficient for me to apply the rulings of this order to those

documents.  I shall have plaintiff's counsel do that in the first

instance and produce those documents covered by this order.  In the

event there is need to further address them, they should be

submitted to me promptly for *in camera* review.


Regarding the movant's request for an award of expenses and

fees, I find the plaintiff's opposition to the motion

18

"substantially justified" so as to preclude such an award.  <u>Fed. R. Civ. P.</u> 37(a)(4).


        In accordance with the foregoing,


        IT THEREFORE HEREBY IS ORDERED:

        1.  All plaintiff's "general objections" are overruled.

        2.  Plaintiff shall, within twenty days, produce all documents and things in its possession, custody or control which are responsive to Requests for Production Numbers 1, 8, and 22 for the time period commencing when its contract with Sandoz was signed and ending on the date the contract, as extended, expired.

        3.  That portion of the motion to compel which seeks documents and things related to the plaintiff's prosecution of patent applications is denied.

        4.  Plaintiff shall, within twenty days, produce all documents and things in its possession, custody or control which are responsive to Requests for Production 1, 2, 4, 7, 12-13, 15-17, and 19 for the time period commencing when its contract with Sandoz was signed and ending on the date the contract, as extended, expired.

        5.  That portion of the motion which requests an award of expenses and fees is denied.  Each party shall bear its own expenses in respect to this discovery dispute.



        DATED January 26, 2006


                                  s/ *David L. Piester*
                                  United States Magistrate Judge