IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | ) ) ) | |
| Plaintiff, | ) ) | 4:04CV3356 |
| v. | ) ) | |
| BASF CORPORATION, | ) ) | MEMORANDUM AND ORDER |
| Defendant, | ) ) | |
| and | ) ) | |
| MONSANTO COMPANY, | ) ) | |
| Intervening Plaintiff. | ) | |

Intervening plaintiff Monsanto Company ("Monsanto") has moved to disqualify defendant BASF Corporation's ("BASF") counsel in this action, Gregg F. LoCascio, Charanjit Brahma, and the firm of Kirkland & Ellis LLP ("K&E"). Monsanto claims that K&E has a conflict of interest which disqualifies them from ethically representing BASF in this case.

Monsanto claims that it has been a client of K&E since 2000, in that it is a defendant represented by K&E in pending litigation in Mississippi. Monsanto contends that its interests in this case are directly adverse to those of BASF and that Monsanto did not give K&E informed consent to represent BASF in this litigation. It concludes that K&E's continued representation of BASF in this case is prohibited by both the Nebraska Rules of Professional Conduct and the Nebraska Code of Professional Responsibility and thus by the local rules of this court.

BASF counters with arguments that K&E has represented BASF for years, that it did not learn of Monsanto's claim to an exclusive license of the technology at the center of this case until after it had commenced its representation of BASF, and that it did obtain Monsanto's informed consent to continue representing BASF in this case.  It further contends that the Mississippi litigation is unrelated to this case and Monsanto's motion is part of a broader strategy to extract business concessions from BASF.  It argues that the alleged conflict, if it exists, was created by Monsanto and was "thrust upon" K&E, and further, that disqualification would deny BASF its counsel of choice to its significant prejudice.  Filing 86.[1]

                                FACTS

Monsanto was sued in state court in Mississippi by Delta and Pine Land Company ("DPL") by complaint filed January 18, 2000.  Filing 82, Exhibit 2.  That litigation is a breach of contract suit which concerns, *inter alia*, alleged failures of Monsanto to take commercially reasonable efforts to obtain antitrust clearance to effect a merger with the plaintiff ("a commercial breeder, producer and marketer of cotton and soybean planting seed"), termination of their merger agreement, and resulting losses in value of the plaintiff's stock.  Filing 82, Exhibit 2.  Monsanto filed its answer in that case on January 31, 2000.  The answer bears the signature of local counsel from Mississippi and K&E.  Filing 82, Exhibit 3.  There is no evidence that K&E represented Monsanto at any earlier time.

---

[1] Monsanto has moved to strike the declaration of Thomas D. Morgan, filed in opposition to its motion to disqualify.  The declaration is largely conclusions based upon K&E's version of facts, some of which are disputed.  I have not considered the declaration.

                                  2

In representing Monsanto in the course of the DPL case for the last five years, K&E has been paid "millions of dollars in legal fees," has viewed "millions of pages of Monsanto's confidential records and information regarding recombinant DNA gene technology, including technology relating to herbicide resistance and other issues associated with Monsanto's biotechnology business strategy," and has "worked very closely with numerous top level executives, scientists, and lawyers at Monsanto in...discussing...Monsanto's biotechnology and acquisition strategies." Affidavit of David F. Snively, Deputy General Counsel of Monsanto, Filing 82, Exhibit 3.

This case was filed November 17, 2004. It seeks a declaratory judgment that BASF has "no right, title, or interest" in a non-exclusive license "to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related to deriving dicamba resistance" to which the plaintiff has rights under a contract with defendant's predecessor in interest, Sandoz Agro, Inc. Complaint, Filing 1.

K&E attorneys Brahma and LoCascio sought and received admission pro hac vice to represent the defendant on December 23, 2004. Filings 8 - 11.

On January 12, 2005 Monsanto and plaintiff (variously referred to in the documents as "Board," "University," or "Nebraska") entered into a license agreement in which plaintiff granted Monsanto an exclusive license to the Dicamba-resistant technology at issue in this case. Affidavit of Dennis R. Hoerner, Senior Counsel-Intellectual Property for Monsanto,

3

Filing 82, Exhibit 4; Complaint in Intervention, Filing 76, para.
13 - 15.

There is no evidence that either plaintiff or Monsanto
publicly disclosed the existence, parties, or terms of this
agreement until March 23, 2005 in a news release issued by the
Institute of Agriculture and Natural Resources, University of
Nebraska-Lincoln.  Filing 86-3, Exhibit C, Attachment 1.  Nor
before that date had counsel for plaintiff disclosed the
agreement to counsel for BASF.  Id.  The news release did not
disclose the date the agreement had been executed.  Id.

A motion to dismiss was filed on behalf of BASF by attorneys
Brahma and LoCascio and K&E and local counsel Houghton on January
21, 2005.  Filing 20.  The motion to dismiss was denied on March
7, 2005.  Filing 27.

Attorney Brahma at K&E discovered the news release "in late
March, 2005."  Filing 86, Exhibit C.  On Monday, March 25, 2005
he informed fellow K&E attorney Assaf that he had discovered on
the internet a news release announcing the University-Monsanto
licensing agreement.  K&E obtained authorization from BASF to
contact Monsanto in advance of BASF's April 6 answer deadline in
this case.  Assaf, through fellow K&E attorney LoCascio, sought
from Emily Nicklin, a partner in K&E's Chicago office, the name
of someone at Monsanto to contact.  LoCascio sent an email to
Nicklin advising her of the news release and included a copy.  On
March 28 Nicklin forwarded LoCascio's email to David Snively at
Monsanto.  See Filing 86, Exhibit B.  LoCascio's email to Nicklin
contained the following:

> As background, our client BASF was sued by the Univ of
> Nebraska in a DJ action seeking a determination that

4

> BASF has no rights in this technology.  BASF acquired a
> non-exclusive license to these same rights in 1997 via
> an acquisition from Sandoz Agro.  BASF & K&E had
> prepared a counterclaim to be filed [M]onday seeking an
> injunction against the University preventing them from
> licensing the rights in a manner inconsistent with
> BASF's license.  Earlier this week, the university
> apparently went ahead anyway and gave Monsanto an
> exclusive license to these same rights.

Filing 86, Exhibit E.

On April 5, 2005 K&E attorney Assaf telephoned Snively at
Monsanto and was put in telephone contact with Dennis Hoerner,
Senior Counsel--Intellectual Property.  Assaf informed Hoerner of
K&E's representation of BASF.  The remaining content of that
conversation is in dispute.  According to Hoerner's affidavit,
Assaf said that K&E "would be" representing BASF in this case,

> even though [K&E] represented Monsanto in other
> litigation and understood that Monsanto had a license
> from the University to the Dicamba-resistant plant
> technology at issue in the declaratory judgment suit.
> I was not overly concerned about the University's claim
> for declaratory judgment against BASF because
> regardless of whether Monsanto held an exclusive or
> non-exclusive license to the technology, it would still
> have the freedom to operate in the area of Dicamba-
> resistant plant technology.  Neither during our
> conversation, nor in his letter of April 7, 2005 that
> followed, did counsel for BASF inform me that BASF had
> filed a Counterclaim against the University seeking
> title to technology that was a part of the License
> Agreement between Monsanto and the University.

Filing 82, Exhibit 4, p. 2.

Assaf's recollection, however, is quite different.  Assaf
recalls that he informed Hoerner that (1) K&E had been
representing BASF in this dispute since November, 2004; (2) BASF
had a pre-existing non-exclusive license to the dicamba-related

technology, and any "alleged 'exclusive' license grant from the
Board to Monsanto was ineffective"; (3) it was the view of BASF
and K&E that the Board had no right to license what it did not
own, that the Board did not own the subject technology, and that
Monsanto may have been taken advantage of by the Board; (4) K&E
would continue to aggressively litigate on behalf of BASF; and
(5) K&E would be filing an answer and counterclaims against the
Board "to vindicate BASF's rights."  Filing 86, Exhibit B.  He
states that Mr. Hoerner consented to K&E's continued
representation of BASF, requiring only that BASF have other
counsel take any depositions from Monsanto.  He also states that
Mr. Hoerner never mentioned Monsanto's "exclusive" license
rights, and never expressed any lack of authority to consent to
K&E's continued representation.  Id.

        BASF's Answer and Counterclaims were filed in this case on
April 6, 2006.  Filing 30.  The counterclaims' prayer for relief
seeks a declaration that the rights under the contract between
plaintiff and Sandoz Agro, Inc. were properly transferred and are
valid, and enjoining the plaintiff from "taking any action
contrary to BASF's ownership or license rights under the
Contract."  Id.

        Assaf wrote a letter to Hoerner on April 7, 2005 to
"follow[] up on our discussion earlier this week regarding the
BASF/University of Nebraska dispute."  It continued, "As we
discussed, while Nebraska has entered into a license with
Monsanto, there is no conflict.  While we all agree there is no
conflict, there may be 'indirect adversity' issues."  Filing 82,
Exhibit 5.  Monsanto did not respond to Assaf's letter and has
never signed any writing explicitly waiving any conflict of
interest posed by the firm's representation of BASF in this case

and Monsanto in the DPL case.  Monsanto's "consent" did not result from its usual practice in evaluating potential conflict situations.  Snively Affidavit, Filing 82, Exhibit 4.

"Monsanto"[2] first learned of BASF's claim to title in the biotechnology at issue in this case in late August or early September, 2005 when "Monsanto" contacted counsel for plaintiff and received copies of the pleadings, including BASF's Answer and Counterclaims.  Affidavit of Dennis Hoerner, Filing 82, Exhibit 4.

After BASF filed its Answer and Counterclaims in this case, an initial scheduling order was entered and the parties began discovery.  A planning conference was held and a final scheduling order was entered setting a trial in February, 2006.  Filing 37. A motion to compel discovery was filed by BASF in November, 2005, however, which stalled the progression of the case.  As well, on January 25, 2006 Monsanto filed its motion to intervene.  Also during that general time period all three of the present parties engaged in negotiations attempting to resolve the entire dispute. See Filing 65.

The court resolved the motion to compel on January 26, 2006, filing 56, but the response deadlines on the motion to intervene were extended because of the parties' negotiations.  Filing 66. When that effort failed, the parties completed the filing of evidence and briefs on the motion to intervene, which was finally submitted on April 24, 2006.  Filings 72-73.

--------

[2] No person at Monsanto is identified as having "first learned" this information or having contacted plaintiff's counsel.

7

In the midst of the parties' settlement discussions, on April 5, 2006 (ironically exactly one year after the phone conversation between Hoerner and Assaf), David Snively wrote a letter to James H. Schink, the General Counsel of K&E, objecting to K&E's continued representation of BASF in this case and requesting that K&E withdraw.  Filing 82, Exhibit 3, Attachment A.

Schink responded by letter to Snively on April 10, 2006 outlining the reasons he believed K&E's withdrawal was not ethically required under the circumstances.  Filing 86-3, Exhibit H.

In response to Schink's letter, Snively again wrote to him on May 4, 2006 advising that Monsanto's alleged "consent" to K&E's continued representation of BASF was not "informed," and that Monsanto would take "all necessary and appropriate action to protect its interest."  Filing 82, Exhibit 3, Attachment B.

By order entered May 11, 2006 (filing 74) the court granted Monsanto's motion to intervene.  Monsanto filed its complaint in intervention on May 18, 2006, filing 76, followed on June 9, 2006 with the present motion to disqualify counsel.  Filing 80.

Since the inception of the case, K&E's lawyers have expended huge amounts of time and resources in their investigation of BASF's and the plaintiff's claims and defenses and preparation of pleadings, evidence, and briefs.  Assaf Declaration, Filing 86, Exhibit 2.  Likewise since the inception of the DPL litigation, different K&E lawyers have expended huge amounts of time and resources representing Monsanto.  Monsanto intends to retain K&E

as its lawyer in the DPL case.  Snively Affidavit, Filing 82, Exhibit 4.

## DISCUSSION

It is within the trial court's discretion to disqualify counsel in particular fact situations in order to preserve the integrity of the court and the proceedings and to avoid confusion among jurors or an appearance of partiality in the case at hand. However, that discretion must be carefully exercised, as such motions can be asserted for a variety of tactical reasons, and the disqualification of counsel deprives the client of counsel of its choice.

> The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the trial court, and we will reverse this determination only upon a showing of abuse of that discretion.  <u>A. J., by L. B. v. Kierst</u>, 56 F.3d 849, 859 (8th Cir. 1995).  Because of the potential for abuse by opposing counsel, "disqualification motions should be subjected to 'particularly strict judicial scrutiny.'"  <u>Optyl Eyewear Fashion Int'l Corp. v. Style Cos.</u>, 760 F.2d 1045, 1050 (9th Cir.1985) (quoting <u>Rice v. Baron</u>, 456 F. Supp. 1361, 1370 (S.D.N.Y.1978)).  When reviewing a decision of a district court on a motion for disqualification of an attorney, we apply the same rules governing the professional conduct of attorneys that the district court has adopted.  See <u>Blair v. Armontrout</u>, 916 F.2d 1310, 1333 (8th Cir.), cert. denied, 502 U.S. 825 (1991).

<u>Harker v. Comm'r of Internal Revenue</u>, 82 F.3d 806, 808 (8th Cir. 1996).  See also, <u>Grahams Service Inc. v. Teamsters Local 975</u>, 700 F. 2d 420, 423  (8th Cir. 1982); <u>Rocchigiani v. World Boxing Counsel</u>, 82 F. Supp. 2d 182, 186-9 (S.D. N.Y. 2000), and cases cited therein.

9

This court has specifically not incorporated any particular code or ethical rules of professional conduct.  Instead, the applicable local rule establishes as a general rule that an attorney admitted to practice must not engage in "conduct unbecoming of a member of the bar."  NEGenR 1.7(b)(2)(B).  The rule permits the court to consult others' rules or codes of professional conduct if it would be helpful in resolving issues before it.  Id.  In this case I have utilized the American Bar Association Annotated Model Rules of Professional Conduct, because K&E is a "national law firm," and because the model rules inform the court on generally applicable standards in concurrent representation issues.  The question, however, is to be determined based on federal law.  State of Arkansas v. Dean Foods Products Co., Inc., 605 F. 2d 380, 383 (8th Cir. 1979), overruled on other grounds, In Re Multi-Piece Rim Products Liability Litigation, 612 F. 2d 377 (8th Cir. 1980).

The American Bar Association's Annotated Model Rules of Professional Conduct, Fifth Edition (2003) address these subjects as follows:

RULE 1.7 CONFLICT OF INTEREST:  CURRENT CLIENTS

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

   (1) the representation of one client will be directly adverse to another client; or

   (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

10

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

The "General Principles" in the Comment to this rule include the following:

[2] Resolution of a conflict of interest problem under this Rule requires the lawyer to:  1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing.  The clients affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).

[5] Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter.  Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict.  The lawyer must seek court approval where necessary and take steps to minimize harm to the clients.  See Rule 1.16.  The lawyer must

11

continue to protect the confidences of the client from
whose representation the lawyer has withdrawn.  See
Rule 1.9(c).

[6] Loyalty to a current client prohibits undertaking
representation directly adverse to that client without
that client's informed consent. Thus, absent consent, a
lawyer may not act as an advocate in one matter against
a person the lawyer represents in some other matter,
even when the matters are wholly unrelated. The client
as to whom the representation is directly adverse is
likely to feel betrayed, and the resulting damage to
the client-lawyer relationship is likely to impair the
lawyer's ability to represent the client effectively.
In addition, the client on whose behalf the adverse
representation is undertaken reasonably may fear that
the lawyer will pursue that client's case less
effectively out of deference to the other client, i.e.,
that the representation may be materially limited by
the lawyer's interest in retaining the current client.
Similarly, a directly adverse conflict may arise when a
lawyer is required to cross-examine a client who
appears as a witness in a lawsuit involving another
client, as when the testimony will be damaging to the
client who is represented in the lawsuit. On the other
hand, simultaneous representation in unrelated matters
of clients whose interests are only economically
adverse, such as representation of competing economic
enterprises in unrelated litigation, does not
ordinarily constitute a conflict of interest and thus
may not require consent of the respective clients.

[18] Informed consent requires that each affected client be
aware of the relevant circumstances and of the material and
reasonably foreseeable ways that the conflict could have
adverse effects on the interests of that client.  See Rule
1.0(e) (informed consent).  The information required depends
on the nature of the conflict and the nature of the risks
involved.

Regarding "Informed Consent," the Comments to Rule 1.7 state:

One condition necessary for curing an otherwise
impermissible conflict is that the client give informed
consent, after full disclosure of the nature and
implications of the lawyer's conflict.  Informed consent
denotes the client's agreement to the lawyer's proposed
course of conduct after the lawyer has communicated adequate

12

information and explanation about the material risks of--
and reasonably available alternatives to--the proposed
course of conduct.

Further comments to Rule 1.7 include:

Rule 1.7(b)(4) requires a lawyer to obtain written
confirmation of a client's consent to the lawyer's conflict
of interest.  This is a new requirement, imposed by the 2002
amendments to the Model Rules.  Note that "written
confirmation" is not the same as "written consent"; Rule
1.0(b) defines "written confirmation" to include a letter
from the lawyer to the client confirming the client's oral
consent.

Applicable definitions in Rule 1.0 are as follows:

(e) "Informed consent" denotes the agreement by a person to
a proposed course of conduct after the lawyer has
communicated adequate information and explanation about the
material risks of and reasonably available alternatives to
the proposed course of conduct.

Rule 1.0 defines "Confirmed in writing" as follows:

(b) "Confirmed in writing," when used in reference to the
informed consent of a person, denotes informed consent that
is given in writing by the person or a writing that a lawyer
promptly transmits to the person confirming an oral informed
consent.  See paragraph (e) for the definition of "informed
consent."  If it is not feasible to obtain or transmit the
writing at the time the person gives informed consent, then
the lawyer must obtain or transmit it within a reasonable
time thereafter.

The Comments to Rule 1.0 say:

[6] Many of the Rules of Professional Conduct require the
lawyer to obtain the informed consent of a client or other
person . . . .  The communication necessary to obtain such
consent will vary according to the Rule involved and the
circumstances giving rise to the need to obtain informed
consent.  The lawyer must make reasonable efforts to ensure
that the client or other person possesses information
reasonably adequate to make an informed decision.
Ordinarily, this will require communication that includes a
disclosure of the facts and circumstances giving rise to the
situation, any explanation reasonably necessary to inform

13

the client or other person of the material advantages and disadvantages of the proposed course of conduct, and a discussion of the client's or other person's options and alternatives.  In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel.  A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid.  In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent.  Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent.

[7] Obtaining informed consent will usually require an affirmative response by the client or other person.  In general, a lawyer may not assume consent from a client's or other person's silence.  Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter.  A number of Rules require that a person's consent be confirmed in writing. See Rules 1.7(b) and 1.9(a). For a definition of "writing" and "confirmed in writing," see paragraphs (n) and (b).  Other Rules require that a client's consent be obtained in a writing signed by the client.  See, e.g., Rules 1.8(a) and (g).  For a definition of "signed," see paragraph (n).

Finally, a conflict of interest for one lawyer in a firm is generally imputed to all the lawyers in the same firm.  Rule 1.10 states:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

14

Ordinarily the party seeking to disqualify counsel must bear the initial burden of coming forward with evidence to justify disqualification.  Weeks v. Indep. School Dist. No. I-89 of Okla. County, 230 F.3d 1201, 1212 (10th Cir.2000).  Ultimately, however, the attorney sought to be disqualified must demonstrate that disqualification is not required under the circumstances. In re BellSouth Corp., 334 F. 3d 941, 961 (11th Cir. 2003); A.J. by L.B. v. Kiersz, 56 F. 3d 849, 859 (8th Cir. 1995); Regent Insurance Co. v. Insurance Company of North America, 804 F. Supp. 1387, 1390 (D. Kan. 1992); Pacific Employers Ins. Co. v. P. B. Hoidale Co., Inc., 789 F. Supp. 1112, 1113 (D. Kan. 1992).

There are several critical issues to resolve in determining this motion.  Among them are:  First, is the DPL case related to this one?  Second, if so, did Monsanto give K&E its "informed consent" to K&E's continued representation of BASF in this case? Third, if not, has Monsanto waived its right to complain by failing to promptly assert its rights?  Fourth, if not, was the conflict "thrust upon" K&E by the actions of Monsanto?  Fifth, if not, may K&E nevertheless continue to represent BASF in this case despite the conflict?

Related Cases.

Monsanto has produced no evidence that the two cases are in fact related.  Mr. Snively's affidavit says in broad, conclusory terms that they are related.  He states that K&E lawyers have been privy to "millions of pages of Monsanto's confidential records and information regarding recombinant DNA gene technology, including technology relating to herbicide resistance and other issues associated with Monsanto's biotechnology business strategy," and have "worked very closely with numerous

15

top level executives, scientists, and lawyers at Monsanto
in...discussing...Monsanto's biotechnology and acquisition
strategies." Affidavit of David F. Snively, Deputy General
Counsel of Monsanto, Filing 82, Exhibit 3. However, Monsanto has
produced no evidence describing any specific items of such
information, documents, biotechnology or acquisition strategies
which have been shared with K&E, and no evidence that any such
information relates to BASF's claims in this litigation. In
addition, the pleadings from the Mississippi case do not
demonstrate that any of the issues in that case trace the issues
in this case. I cannot simply accept his conclusions without
evidence. The record does establish that there is now a conflict
of interest for K&E, but not that the two matters are related.
Compare <u>Wycoff v. Nix</u>, 869 F.2d 1111, 1117 (8th Cir. 1989)[3]
(Concurrent representation of a defendant and a prison guard who
was a possible witness).

Recognizing that my conclusion in this matter may not be the
last word, however, I address the other issues.

<u>Monsanto's Consent</u>.

I conclude that Monsanto's consent was not "informed" so as
to excuse K&E's continued representation of BASF. First, the
evidence establishes that the discussion between Mr. Asaff and
Mr. Hoerner was anything but thorough. While Mr. Asaff states
now that he discussed a number of possible conflicts, he does not

---

[3] "'When an attorney attempts to represent his client free
of compromising loyalties, and at the same time preserve the
confidences communicated by a present or former client in the
same or a substantially related matter, a conflict arises.' <u>U.S.
v. Agosto</u>, 675 F.2d 965, 971 (8th Cir. 1982), cert. denied, 459
U.S. 834(1982)."

16

now state what possibilities were discussed, nor possible
ramifications of them.  It appears from his declaration that the
closest he came to such a discussion was informing Mr. Hoerner
that "an alleged 'exclusive' license grant from the Board to
Monsanto was ineffective."  He does not state that he told
Hoerner BASF's position was directly in conflict with Monsanto's
interest in the subject technology.  Further, his "confirming"
letter did even less.[4]  Mr. Hoerner's affidavit is to the effect
that he did not give the matter much critical attention; indeed,
he did not even initiate the normal internal review procedures
for evaluating possible conflict situations.  I find that
puzzling, given the enormity of the stakes in this litigation; it
begs the question of whether that attitude was the product of his
own lack of attention, or being misled by Mr. Asaff, or something
else.  In any event, the evidence before the court is
insufficient to demonstrate that Monsanto was "aware of the
relevant circumstances and of the material and reasonably
foreseeable ways that the conflict could have adverse effects on
[its] interests," nor that it agreed "to a proposed course of
conduct after the lawyer has communicated adequate information
and explanation about the material risks of and reasonably

---

[4]His characterizing of the "possible" conflict as "indirect
adversity" is misleading; even giving K&E the benefit of its
argument that it did not know--exactly--the particulars of the
technology claimed to be the subject of both contracts, and even
though it did not know--exactly--the terms of Monsanto's
contract, how BASF's position, taken with the contemporaneous
filing of its counterclaim, that it holds a "non-exclusive"
license was only a "potential" conflict with Monsanto's claim to
an "exclusive" license eludes me.  Moreover, the letter does not
even allude to--much less recount with particularity--what Mr.
Asaff now says was Mr. Hoerner's only "condition" on K&E's
continued representation of BASF, that separate counsel depose
any Monsanto witnesses.

available alternatives to the proposed course of conduct."[5]   I conclude that K&E has not shown that it engaged in the type of disclosure demanded by its fiduciary obligation to Monsanto, and as a result, Monsanto has not given K&E its informed consent to continue representing BASF in this case.

Monsanto's Waiver

K&E argues that Monsanto has waived the conflict by not taking action earlier.  The argument has merit.  Mr. Hoerner, although put "on notice" of the potential conflict, apparently took no action himself to investigate the matter until four or five months later when he or someone else at Monsanto decided to pursue it with plaintiff's counsel.  Nor did he initiate any internal inquiry about the possibility of formally waiving the conflict.  His affidavit says that he "was not overly concerned about the University's claim for declaratory judgment against BASF because regardless of whether Monsanto held an exclusive or non-exclusive license to the technology, it would still have the freedom to operate in the area of Dicamba-resistant plant technology."[6]   K&E faults Monsanto for not protesting its representation of BASF long before it filed its motion to disqualify counsel, and points to the phone call and letter from Mr. Snively to Mr. Schink one year after Mr. Asaff's telephone notice to Mr. Hoerner.

---

[5] That BASF has consented to the conflicting representation may be inferred from the fact that K&E continues to represent it; however, K&E has produced no evidence to that effect.

[6] According to Hoerner's affidavit, Monsanto's contract with the plaintiff provides that if Monsanto's license is ultimately found to be non-exclusive, Monsanto would pay plaintiff royalties at a reduced rate.  Filing 82, Exhibit 4.

Monsanto argues that it took prompt action to seek a global resolution of the dispute, involving all three parties, prior to seeking intervention in this case and moving for K&E's disqualification, and that it promptly filed the motion as soon as practicable after its complaint in intervention.  It argues it should not be penalized for attempting to resolve the matter informally as part of the parties' settlement discussions.

The Eighth Circuit has required that motions to disqualify opposing counsel be made in a timely fashion.  <u>Central Milk Producers Co-op. v. Sentry Food Stores, Inc.</u>, 573 F.2d 988, 991-992 (8th Cir. 1978) (delay of two years after discovery of factual basis for motion held to be waiver).[7]  See also <u>Greenwalt v. Wal-Mart Stores, Inc.</u>, 253 Neb. 32, 38 (1997)(Party waived

---

[7] "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion.  This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed.  Here appellants not only waited more than two years after they knew Futterman had been hired to formally raise the issue, but they specifically approved the arrangement followed by Pressman and Hartunian with respect to screening Futterman from the case.  It is not claimed that this arrangement has been violated.  In view of these circumstances we find that appellants have waived their right to object to the hiring of Futterman.  See <u>Redd v. Shell Oil Co.</u>, 518 F.2d 311, 315 (10th Cir. 1975); <u>United States Fidelity & Guaranty Co. v. Bolding</u>, 447 F.2d 462, 464 n. 1 (10th Cir. 1971); <u>Milone v. English</u>, 306 F.2d 814, 818 (D.C. Cir. 1962); <u>Marco v. Dulles</u>, 169 F. Supp. 622, 632 (S.D. N.Y.), appeal dismissed, 268 F.2d 192 (2nd Cir. 1959).  Cf. ABA Comm. of Professional Ethics, Opinions, No. 342 (1975) (allows waiver by government of prohibition of ex-government attorney representing another party against the government in a matter substantially related to work conducted while a government employee); ABA Code of Professional Responsibility DR-5-105(C) (allows representation of multiple clients if full disclosure and consent by clients).  But see <u>W. E. Bassett Co. v. H. C. Cook Co.</u>, 201 F. Supp. 821 (D. Conn.), aff'd, 302 F.2d 268 (2nd Cir. 1962)."

conflict by failing to file interlocutory petition for peremptory
writ of mandamus or any other interlocutory review of the
district court's denial of WalMart's motion to disqualify
Greenwalt's counsel).

Although Monsanto's delay was not dictated by the
circumstances, that is, there is no reason shown why it could not
have with diligence investigated the matter in the days
immediately following the first call from Mr. Asaff to Mr.
Hoerner, some of that delay can be attributed to K&E's failure to
provide Mr. Hoerner a complete, accurate picture of the
situation.  In addition, the delay was not inordinate under the
totality of the circumstances.  I do not fault Monsanto for its
delay.

Monsanto's "Thrust"

K&E argues that it was Monsanto that created the conflict in
the first place, by its contracting with plaintiff in January,
2005, and in any event, the direct conflict did not arise until
Monsanto became a party to this case, thus "thrusting" the
conflict on K&E.  Although Monsanto argues that this doctrine
does not apply in this circumstance, I disagree.  At the time K&E
commenced its representation of BASF in this dispute[8]--sometime
near the date of the filing of the complaint herein on November
17, 2004--it had represented BASF for a number of years.  Prior
to the DPL litigation, K&E had not represented Monsanto.  When
this case was filed, there was no notion that any other party was
involved, much less a current client that would be taking a

---

[8] The evidence is that K&E has represented BASF for a long
period of time, but the DPL litigation is the first time it has
represented Monsanto.

position adverse to BASF.  The conflict arose with the contract
between the plaintiff and Monsanto in January, 2005.  From K&E's
perspective it was an "unforeseeable development" as that term is
used in Model Rule 1.7.[9]

Principle 5 following that rule requires K&E to take steps
to minimize harm to the clients.  In this case wholly different
litigation teams from K&E are representing BASF in this case and
Monsanto in the DPL litigation; none of the lawyers involved has
represented the other client.  Assaf Declaration, Filing 86,
Exhibit B.  Monsanto has argued that K&E lawyers have been privy
to "millions of pages of Monsanto's confidential records and
information regarding recombinant DNA gene technology, including
technology relating to herbicide resistance and other issues
associated with Monsanto's biotechnology business strategy," and
have "worked very closely with numerous top level executives,
scientists, and lawyers at Monsanto in...discussing...Monsanto's
biotechnology and acquisition strategies."  Affidavit of David F.
Snively, Deputy General Counsel of Monsanto, Filing 82, Exhibit
3.  However, it has produced no evidence describing any specific
items of such information, documents, biotechnology or
acquisition strategies which have been shared with K&E, and no
evidence that any such information relates to BASF's claims in
this litigation, and no evidence that any such information has
been shared between the two teams of lawyers at K&E.  More
importantly, even if such information has been shared, there is
in this record no showing of any resulting prejudice to Monsanto
in either this case or the Mississippi case.  Should the motion
to disqualify be denied, K&E would still be required to keep
inviolate the confidential information and trade secrets of

---

[9] I reject Monsanto's argument that the rule applies only in
corporate acquisition situations.

Monsanto; in this regard it may be that the proverbial "Chinese wall" would be necessary to keep such information--both Monsanto's and BASF's--from the lawyers for the other client.[10]

K&E's Continued Representation.

I am for a number of reasons persuaded that the court should not disqualify K&E from continuing its representation of BASF. In Gould v. Mitsui Mining, 738 F. Supp. 1126 (N.D. Ohio 1990) the court faced a similar, though not identical, issue.  It considered the following factors:  prejudice to the moving party; receipt of confidential information as a result of the other representation; the cost of retaining new counsel, in terms of both time and money; the delay to the litigation caused by requiring the first-represented client to obtain new counsel; the complexity of the issues in the case and the time it would take new counsel to acquaint themselves with the facts and issues; and the fact that the conflict was created by merger after the case was commenced, not by any affirmative act of counsel.  Id. at 1126-27.  See also, University of Rochester v. G. D. Searle & Co., Inc., 2000WL1922271 (W. D. N. Y. 2000).  All of these factors favor allowing K&E to remain as BASF's counsel in this case.

First, the record before me does not show any prejudice to Monsanto from allowing K&E to continue representing BASF in this case.  As noted above, its conclusory statements do not constitute evidence, rather, they leave the matter to possibility and conjecture.

---

[10] The court is not required to impose specific safeguards, and will not do so.  That is the obligation of K&E.

22

Second, the record does not demonstrate that any of Monsanto's confidential information has been given to K&E's lawyers working on this case.  Given the continued obligation of K&E to keep its clients' confidences, I think it possible for K&E to protect those confidences as to both Monsanto in the Mississippi litigation and BASF in this case.

Third, I believe that requiring K&E's withdrawal at this point would not only deprive BASF of its chosen counsel, but would also cause it to incur enormous amounts of time and money in finding and educating new counsel to continue in this case.  I would be inclined to this result, nevertheless, had I found it necessary to preserve the integrity of the proceedings and eliminate any "taint" caused by the concurrent representation. The record before the court does not demonstrate the necessity to do so in these circumstances.   See, Rocchigiani 82 F. Supp. 2d at 186-187; Hickman v. Burlington Bio-Medical Corp., 371 F. Supp. 2d 225, 229 (E.D. N. Y. 2005).

In addition, were I to disqualify K&E and require new counsel, this case would be delayed substantially to permit new counsel to get "up to speed" with the other parties and adequately prepared to go forward.  This is complex litigation. The court will be called upon to resolve issues of great factual and scientific intricacy against a backdrop of a marketplace of competitive pressure to develop new products.  The case has already been on file for over a year and a half, and the pleadings are just now reaching closing.[11]  It is important that the case not be delayed unnecessarily.

---

[11] If the pending motion to intervene by Syngenta Crop Protection, Inc., filing 99, be granted, the pleadings will remain open for some additional time.

Finally, the conflict now facing K&E was not of its own making. At the time it undertook to represent BASF in this case, Monsanto was not involved. The first occasion for K&E to learn of Monsanto's possible interest was approximately March 25, 2005, after it had undertaken the representation of BASF in this case. Since there has been no showing that the two cases are related, I see no substantial harm and no taint to the proceedings in this court by allowing K&E to remain as counsel for BASF.

In sum, Monsanto has failed to meet its burden of demonstrating that the two cases are substantially related, but even if it had, the factors considered lead to the conclusion that K&E should not be disqualified.

IT THEREFORE HEREBY IS ORDERED:

1. Monsanto's motion to strike, filing 92, is denied as moot.

2. Monsanto's motion to disqualify counsel, filing 80, is denied.

3. BASF's motion for hearing, filing 98, is denied.

4. BASF's motion for a stay of discovery, filing 89, is granted in part, and except as may be otherwise agreed among counsel, discovery in this case is stayed until the pending motion to intervene, filing 99, has been resolved. Within thirty days following the court's order deciding the pending motion to intervene, counsel shall again "meet and confer" pursuant to Fed. R. Civ. P. 26(f) and provide to the court their views on an appropriate schedule for progression of this case to trial. In the event a conference with the court is desired, request therefor may be made by telephoning chambers.

24

DATED this 17th day of August, 2006.

BY THE COURT

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge