THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | ) ) ) | 4:04CV3356 |
| Plaintiff, | ) ) | |
| vs. | ) ) | **MEMORANDUM** |
| BASF CORPORATION, | ) ) | **AND ORDER** |
| Defendant, | ) ) | |
| and | ) ) | |
| MONSANTO COMPANY, | ) ) | |
| Intervening Plaintiff, | ) ) | |
| and | ) ) | |
| SYNGENTA CROP PROTECTION, INC., | ) ) | |
| Intervening Defendant. | ) ) ) | |

Patent licenses are "personal." Without permission, they cannot be transferred by assignment or by merger. Applying these principles, I grant summary judgment. Finding that the word "affiliated" is ambiguous, I deny summary judgment because the meaning of that word will require a trial (with the attendant consequence that I will be driven mad trying to understand the differences, if any, between the principles of contract construction and contract interpretation in the patent context). The following 30-plus pages of mind-numbing detail explain the particulars.

Sifting through thousands of pages of complaints, answers, replies, and exhibits

containing scores of claims, cross-claims, and counterclaims reveals one main question in this contract action—that is, which party or parties possess a right, title, or interest in inventions, including know-how and resulting patents, in technology developed by the University of Nebraska ("University") with funding from Sandoz Agro, Inc. (Filing 170, Amended Complaint ¶ 1.) The "technology" at issue is "the development of crops tolerant to treatment with products containing the SANDOZ herbicide, dicamba." (Filing 170-2, Ex. A to Amended Complaint, Research Contract.)

The parties have filed motions for summary judgment (filings 219, 220, 221, 228, 231, 234, 236) addressing "the interpretation of written agreements and what intellectual property rights, if any, were successfully transferred between the parties and Sandoz Agro, the validity of the University/Monsanto License, and/or patent claim construction issues." (Filing 217, Order Extending Deadline to File Summary Judgment Motions.)

## I. UNDISPUTED MATERIAL FACTS

For purposes of the pending summary judgment motions, the undisputed material facts are these:

### A.    The 1993 Contract

1.    In February 1993, the University and Sandoz Agro, Inc. ("Sandoz Agro") "and its Affiliated companies" entered into a contract (the "Contract"), under which Sandoz Agro agreed to fund research on concepts useful to support the development of crops tolerant to treatment with products containing the Sandoz herbicide, dicamba, and the University agreed to perform the research. (Filing 224-2, CM/ECF pp. 1-6.) Dr. Donald Weeks was to be the principal researcher and project director for the University. (*Id.* § 13.)

2

2.      In exchange for the funding provided by Sandoz Agro,[1] the University agreed to the following provisions relevant to the pending summary judgment motions:

10.     <u>INVENTIONS AND PATENTS</u>

Title to know-how, inventions and, where appropriate, resulting patents made solely by SPONSOR[2] staff or employees and arising from the results of research covered by this CONTRACT shall belong to SPONSOR exclusively.

Title to know-how, inventions, and, where appropriate, resulting patents made solely by UNIVERSITY[3] personnel from the results of research covered by this Contract shall belong to the UNIVERSITY.

Title to inventions including know-how or resulting patents made jointly by UNIVERSITY and SPONSOR personnel shall be assigned to SPONSOR to the extent such assignment is of U.S. Government regulations or laws.  UNIVERSITY agrees to provide SPONSOR with a complete written disclosure of all jointly developed inventions promptly after it is developed or made and shall cooperate with SPONSOR to develop a patent application.

In return for the significant funding provided, UNIVERSITY hereby grants to SPONSOR an irrevocable, world-wide, fully paid up, unrestricted, non-exclusive license with the full right to sublicense to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic

_____

[1]Sandoz Agro agreed to provide two payments of $48,490.00 to the University under the Contract. (*Id.* § 5.)

[2]"Sponsor" is defined in the Contract as "SANDOZ AGRO, INC. having a place of business at 1300 East Touhy Avenue, Des Plaines, IL 60018, and its Affiliated companies." (*Id.* at CM/ECF p. 1).

[3]"University" is defined in the Contract as the "Board of Regents of the University of Nebraska on behalf of the University of Nebraska-Lincoln."  (*Id.* at CM/ECF p. 1.)

3

material related to deriving dicamba resistance to which UNIVERSITY
has any right, title and/or interest in accordance with this CONTRACT.
As further compensation for the license granted herein SPONSOR shall
pay to UNIVERSITY a single, one-time sum of US $100,000 upon first
market introduction of a dicamba resistant crop seed incorporating
genetic material introduced into its germplasm as a result of research
carried out under this CONTRACT.

(*Id.* § 10.)  Section 12 of the Contract provided that "Any terms or conditions of this
CONTRACT governing ownership of data or inventions or licenses resulting from
such ownership shall remain in effect for the terms of the license or the term [of]
ownership as specified by applicable U.S. Government rules or regulations.
Specifically the provisions of Sections 6, 7, 8, 9 and 10 shall survive termination or
expiration of this CONTRACT."  (*Id.* § 12.)

3.     The Contract stated that it was to be "construed, interpreted and applied
in accordance with the laws of the State of Nebraska" and that the contract "sets forth
the entire understanding between the parties as to the intent of the activities to be
conducted by each party and the obligations and rights resulting from such activities."
(*Id.* §§ 15 & 17.)

**B.     The 1995 Option**

4.     In April 1995, the University requested that Sandoz Agro contribute more
funding to Dr. Weeks and his dicamba-resistance research. (Filing 224-3, at CM/ECF
pp. 1-2.)  On June 8, 1995, Sandoz Agro agreed to provide $15,000.00 in additional
funding, and the University and Sandoz Agro entered into an agreement extending the
Contract (hereinafter, the "1995 Option").  (Filing 224-4, at CM/ECF pp. 1-2.)  The
1995 Option extended the Contract until March 1, 1996.   The 1995 Option also
amended Section 10 of the Contract by adding language to and deleting language from
the third paragraph:  "Title to inventions including know-how or resulting patents

4

made jointly by UNIVERSITY and SPONSOR personnel shall be assigned to SPONSOR to the extent such assignment is *permissible, consistent with Board of Regents By-Laws and Nebraska and* ~~of~~ U.S. Government regulations or laws." (*Id.* (added language indicated by italics and deleted language indicated by "strike-out").) Finally, the 1995 Option added the following paragraph to Section 10 of the Contract:

> In addition to the non-exclusive license granted herein SANDOZ is also granted the option to a corresponding worldwide exclusive royalty bearing license to the same subject matter outside the field of dicamba resistant crop plants. Such royalty is subject to negotiation between the parties, and will be in the range of 2 to 5% of net sales unless a party can clearly demonstrate that this range is inconsistent with industry standards for similar technology. The actual royalty rate will be determined on the basis of such factors as strength of patent protection, the respective parties['] contributions in the invention and subsequently in the development of a product to commercial introduction, the contribution of the invention to the ultimate and commercial product, the financial significance of the planned commercial activity and other relevant industry standards.

(*Id.*)

5.     On January 16, 1996, in exchange for an additional $15,000.00 in funding from Sandoz Agro, the University and Sandoz Agro entered into another agreement extending the Contract from March 1, 1996, to March 1, 1997, to allow completion of the research. (Filing 224-5, at CM/ECF p. 1.)[4]

---

[4]On February 7, 1995, Sandoz Agro entered into an agreement with the University to sponsor similar dicamba resistance research by Dr. Steven W. Ragsdale (the "Ragsdale Agreement"). (Filing 224-6, at CM/ECF pp. 1-3.) The conditions governing the funding for Dr. Ragsdale were the same as those set out in the 1995 Contract, with particular reference to Sections 1, 2, 3, 6, 8, 9, 10, 11, 12, 14, 15, and 16 thereof. (*Id.*) The Ragsdale Agreement also contained the same option to a corresponding worldwide exclusive royalty-bearing license to the same subject matter

## C.      The Patents

6.      Dr. Donald Weeks and Dr. Patricia Herman conducted research at the University with funding provided under the Contract from March 1, 1993, through March 1, 1997.  Xiao-Zhou Wang assisted Dr. Weeks and Dr. Herman in their research.  Dr. Wang was a graduate student at the University from August 1990 through August 1996, when she received her Ph.D. from the University. (Filing 230-3, Aff. Donald P. Weeks ¶¶ 4-6.)

7.      On April 4, 2006, U.S. Patent No. 7,022,896 (the "'896 Patent"), entitled "Methods and Materials for Making and Using Transgenic Dicamba-Degrading Organisms" issued from U.S. Patent Application No. 09/055,145, which had been filed on April 3, 1998.  The "[i]nventors" were listed as Donald P. Weeks from Lincoln, Nebraska; Xiao-Zhuo Wang from Chapel Hill, North Carolina; and Patricia L. Herman from Waverly, Nebraska.  The "[a]ssignee" was listed as "Board of Regents of University of Nebraska, Lincoln, NE."  (Filing 223-4, at CM/ECF p. 1.)

8.      On September 12, 2006, U.S. Patent No. 7,105,724 (the "'724 Patent"), entitled "Methods and Materials for Making and Using Transgenic Dicamba-Degrading Organisms" issued from U.S. Patent Application No. 09/797,238, which had been filed on February 28, 2001.  The "[i]nventors" were listed as Donald P. Weeks from Lincoln, Nebraska; Xiao-Zhuo Wang from Chapel Hill, North Carolina; and Patricia L. Herman from Waverly, Nebraska.  The "[a]ssignee" was listed as "Board of Regents of University of Nebraska, Lincoln, NE."  (Filing 223-5, at CM/ECF p. 1.)

---

outside the field of dicamba-resistant crop plants.  (*Id.*)

6

**D.**      **The Asset Purchase Agreement**

9.      On September 26, 1996, Sandoz Ltd.[5] and BASF Aktiengesellschaft ("BASF") entered into an Asset Purchase Agreement.  (Filings 224-9 to 224-15, at SCPI 004174.[6])

10.      The Asset Purchase Agreement stated that Sandoz Ltd. "desires to sell and to cause the Subsidiaries to sell to [BASF] and its Affiliates . . . the portions of the Current Business[7] comprising [Sandoz Ltd.'s] and the Subsidiaries' agricultural dicamba business in the United States and Canada and [Sandoz Ltd.'s] and the Subsidiaries' worldwide dimethenamid business (collectively, the "Business") . . . ." (Filing 224-9, at SCPI 004179, second "Whereas" clause).  In Article II of the Asset Purchase Agreement, the "Assets to be Sold" by Sandoz Ltd. included "all of [Sandoz Ltd.'s] and the Subsidiaries' right, title and interest in and to the assets, goodwill and business constituting the Business listed on Exhibit 2.01(a), other than the Excluded Assets (all such assets, other than the Excluded Assets, being the "Assets")." (Filing 224-9, at SCPI 004183 § 2.01(a).)

11.      The original "List of Assets" in Exhibit 2.01(a) was amended on December 24, 1996. (Filing 224-16, at SCPI 005179 § 1(a)(ii).)  The Amended Exhibit

---

[5]As explained later, Sandoz Agro was an affiliate of Sandoz Ltd., and Sandoz Corporation was a wholly-owned subsidiary of Sandoz Ltd.

[6]All pinpoint citations will refer to the Bates number at the bottom right corner of the relevant pages.

[7] "Current Business" was defined as "the business of manufacturing certain active ingredients known as dimethenamid and dicamba (the "Active Ingredients") and manufacturing, packaging, marketing and distributing certain products based on the Active Ingredients . . . ." (Filing 224-9, at SCPI 004179, first "Whereas" clause.)

2.01(a) "List of Assets" provides:

## I.   <u>General</u>

. . . .

(iii) all the Seller's and the Subsidiaries' ***assignable*** rights and obligations contained in the contracts, leases, licenses, permits, purchase or customer orders, commitments and other binding arrangements of the Seller and the Subsidiaries pertaining principally to the Business;

. . . .

## III.  <u>Dicambas</u>

(i) all the Seller's and the Subsidiaries' right, title and interest in and to Dicamba and Dicamba-Based Products in the United States and Canada and patents related thereto (including those which may incorporate the H-34 process), which patents are more fully described in Section 2.01(a)(III)(i) of the Disclosure Schedule, including patents and any patent applications claiming the same priority as any of such patents;

(ii) all the Seller's and the Subsidiaries' right, title and interest in and to the United States and Canada trademarks and service marks for Dicamba and Dicamba-Based Products as described in Section 2.01(a)(III)(ii) of the Disclosure Schedule;

(iii) all the Seller's and the Subsidiaries' right, title and interest in and to production and formulation know-how for Dicamba and Dicamba-Based Products (including those which may incorporate the H-34 process), including Dicamba and Dicamba-Based Products (including those which may incorporate the H-34 process) that are currently in development, and including all Documents related thereto;

(iv) all the Seller's and the Subsidiaries' product efficacy data, advertising materials and any copyrights related thereto, marketing plans, distribution programs, customer lists and other similar information

8

relating to the operation of the Dicamba and Dicamba-Based Products business, including all Documents related thereto (the "Dicamba Business");

(v) all United States and Canada federal, state, provincial and municipal registrations, franchises, permits, *licenses*, *agreements*, waivers and authorizations held or used by the Seller and/or the Subsidiaries in connection with, or required for, the operation of the Dicamba Business, *to the extent transferable*, and the underlying data and documentation for such registrations, franchises, permits, licenses, agreements, waivers and authorizations, including all Documents related thereto;

(Filing 224-16, at SCPI 005274-005276 (emphasis added).)

12.     The Asset Purchase Agreement also stated: "This Agreement shall be governed by the laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by a panel of these arbitrators appointed in accordance with the Rules. Such arbitration shall be held in Zurich, Switzerland . . . ."[8]  (Filing 224-10, at SCPI 004221 § 11.11.)

13.     On December 24, 1996, Sandoz Agro, Inc., executed a Bill of Sale and Assignment to BASF Corporation related to the Asset Purchase Agreement (the "Bill of Sale and Assignment").  (Filing 224-18, at SCPI 004374-004381.)  The Bill of Sale

––––––––––––––––––––

[8]While various parties cite the part of this paragraph pertaining to the application of New York law, no one mentions the arbitration clause or the effect such clause may have on this litigation.  (Filing 239, BASF's Mem. Supp. Mot. Summ. J. No. 3, at CM/ECF pp. 11 ¶ 22 & 16; Filing 255, Syngenta's Br. Opp'n BASF's Mot. Summ. J. No. 3, at CM/ECF p. 3 (not contesting ¶ 22 of BASF's statement of material facts which refers to the application of New York law, but does not mention the arbitration clause).)

9

and Assignment again defined the "Business" as "the portions of the Current Business[9] comprising Sandoz's and the Subsidiaries' agricultural dicamba business in the United States and Canada and Sandoz's and the Subsidiaries' worldwide dimethenamid business carried on in and from the United States." (Filing 224-18, at SCPI 004374 § 1.)  The Bill of Sale and Assignment also provided:

> **2.      <u>Sale and Assignment of Assets and Properties</u>**.  The Seller does hereby sell, assign, transfer, convey, grant, bargain, set over, release, deliver and confirm unto the Purchaser, its successors and assigns, forever, the entire right, title and interest of the Seller in and to the following assets, goodwill and business constituting a portion of the Business, to the extent applicable, other than the Excluded Assets (as defined below) (all such assets, other than the Excluded Assets, being the "<u>Assets</u>"), wherever located, as they exist on the date hereof, as follows:
>
> . . . .
>
> (iii) all the Seller's ***assignable*** rights and obligations contained in the ***contracts***, leases, ***licenses***, permits, purchase or customer orders, commitments and other binding arrangements of the Seller pertaining principally to the Business;
>
> . . . .
>
> **3.      <u>Assets and Properties Not Sold or Assigned</u>**: The following assets (the "<u>Excluded Assets</u>") are specifically excepted from the Assets to be transferred to the Purchaser pursuant to Section 2 of this Bill of Sale and Assignment:
>
> . . . .

───────────────

[9]"Current Business" was defined as "the business of manufacturing, packaging, marketing and distributing certain products based on the Active Ingredients."  (Filing 224-18, at SCPI 004374 § 1.)

(x)     all other properties and assets of the Seller not expressly identified in this Bill of Sale and Assignment as being an Asset.

(Filing 224-18, at SCPI 004375-004377 (emphasis added).)

14.     The Bill of Sale and Assignment provided that it "shall be governed by the laws of the State of New York.  All actions and proceedings arising out of or relating to this Bill of Sale and Assignment shall be heard and determined in any New York state or federal court sitting in The City of New York."  (Filing 224-18, at SCPI 004378 § 8.)

### E.     Hess Letter to the University

15.     On December 16, 1996, F. Dan Hess, the Vice President of Research of Sandoz Agro, Inc., informed Professor Stephen Ragsdale from the University that Sandoz Agro would not provide a second year of matching funding to the University for Professor Ragsdale's work because "BASF is in the process of purchasing all dicamba based products and all technology associated with these products from Sandoz Agro, Inc." (Filing 224-24, at CM/ECF p. 1.)  Dr. Hess informed Professor Ragsdale that BASF had shown interest in the dicamba-resistant crops project and that BASF would probably continue supporting Professor Ragsdale's research project.  (*Id.*)

### F.     The FTC Order

16.     The Federal Trade Commission ("FTC") issued an "Agreement Containing Consent Order" ("FTC Order") relating to its investigation of the proposed merger between Ciba-Geigy Ltd., including its wholly-owned subsidiary Ciba-Geigy Corporation (collectively, "Ciba"), and Sandoz Ltd., including its wholly-owned subsidiary, Sandoz Corporation (collectively, "Sandoz"), into Novartis Ltd. ("Novartis").  The FTC issued its final order on March 24, 1997. *In the Matter of*

11

*Ciba-Geigy Ltd., et al.*, 123 F.T.C. 842, *available at* 1997 WL 33483248 (Mar. 24, 1997). (Filing 224-7, at CM/ECF pp. 1-16.) In the FTC Order, Ciba, Sandoz, and Novartis are referred to collectively as "Respondents." *Id.* at 855.

17. The FTC order provides that "Respondents shall divest, absolutely and in good faith, as an ongoing business, the Sandoz Corn Herbicide Business to BASF pursuant to the agreement between Sandoz and BASF dated as of September 26, 1996." *Id.* at 865. The FTC defined the Sandoz Corn Herbicide Business as follows: "'Sandoz Corn Herbicide Business' means all physical assets, properties and business located in the United States or Canada and all goodwill, tangible and intangible assets, used by Sandoz in the research, development, manufacture, formulation, registration, distribution or sale of corn herbicides (other than pyridate) in the United States or Canada, all as specified in the Asset Purchase Agreement dated as of September 26, 1996, between Sandoz and BASF." *Id.* at 857. The stated purpose of the divestiture of the Sandoz Corn Herbicide Business was to "ensure the continuation of the Sandoz Corn Herbicide Business as an ongoing, viable enterprise engaged in the research, development, manufacture, distribution and sale of corn herbicides independent of Ciba, Sandoz, and Novartis and able [sic] to compete with Ciba, Sandoz and Novartis and to remedy the lessening of competition alleged in the Commission's complaint." *Id*. at 866.

### G. The Mergers

18. As of November 3, 1995, Sandoz Corporation was the owner of all the shares of common stock of Sandoz Agro, Inc. (Filing 224-25, at SCPI 007105, second "Whereas" clause; Filing 226-2, Aff. Vincent Alventosa ¶ 3.) On December 20, 1996, the following events occurred: (a) Ciba-Geigy Corporation (an affiliate of Ciba-Geigy Limited) purchased all the shares of the capital stock of Novartis Crop Protection, Inc. (Filing 224-27, at SCPI 001021; Filing 224-26, at SCPI 001030; Filing 226-2, Aff.

Vincent Alventosa ¶ 4), and (b) the ultimate Swiss parent entities Ciba-Geigy Limited[10] and Sandoz Ltd.[11] merged to form Novartis, Inc. (Filing 224-27, at SCPI 001019; Filing 226-2, Aff. Vincent Alventosa ¶ 6.) Also on December 20, 1996, by virtue of (a) the fact that Sandoz Agro was an affiliate of Sandoz Ltd., and (b) Sandoz Ltd.'s merger with Ciba-Geigy Limited, Sandoz Agro became an affiliate of Novartis Crop Protection, Inc. (given that such entity was an affiliate of Ciba-Geigy Limited). More simply put, given that Sandoz Agro and Novartis Crop Protection, Inc., had each become affiliates of Novartis, Inc., each in turn had become an affiliate of the other. Thereafter, on January 1, 1997, Sandoz Corporation was merged into Ciba-Geigy Corporation to form Novartis Corporation.[12] (Filing 224-27, at SCPI 001019; Filing 226-2, Aff. Vincent Alventosa ¶ 7.) The final organizational chart for the merged entities shows that both Novartis Crop Protection, Inc., and Sandoz Agro, Inc., are 100-percent owned by Novartis, Inc. (Filing 224-28, at SCPI 001042; Filing 226-2, Aff. Vincent Alventosa ¶ 8.)

19.    Syngenta admits that it did not exist and was not an "affiliate" of Sandoz Agro on March 1, 1993, when Sandoz Agro and the University entered into their Contract, or on June 8, 1995, when the University signed the letter agreement creating the Option. (Filing 246, Syngenta's Br. Opp'n Univ.'s Mot. Summ. J. at CM/ECF pp. 4-5.)

---

[10]Ciba-Geigy Corporation was a wholly-owned subsidiary of Ciba-Geigy Limited. (Filing 224-7, 123 F.T.C. at 854.)

[11]Sandoz Corporation was a wholly-owned subsidiary of Sandoz Ltd. (Filing 224-7, 123 F.T.C. at 854.)

[12]On January 1, 1997, as part of the merger to form Novartis Corporation, Sandoz Agro, Inc., contributed as a dividend to Ciba-Geigy Corporation its crop protection assets and operating liabilities. Ciba-Geigy Corporation immediately contributed such assets and operating liabilities to Novartis Crop Protection, Inc. (Filing 224-27, at SCPI 001021.)

**H.     The Name Changes and Final Merger**

20.     On March 15, 2000, Novartis Crop Protection, Inc., changed its name to Syngenta Crop Protection, Inc. (Filing 224-29.)  Effective December 21, 2005, Sandoz Agro, Inc., merged with and into Syngenta Crop Protection, Inc.  The Certificate of Ownership and Merger stated that Syngenta owned "all of the outstanding capital stock of Sandoz Agro, Inc.," and "shall assume all of the obligations of Sandoz Agro." The Certificate of Merger referred to Syngenta as "the surviving corporation."  (Filings 224-30, 223-20, 223-21.)

**I.     University Licenses With United Agri Products, Inc. & Monsanto**

21.     In October 1997, the University entered into a four-year agreement ("UAP Agreement") with United Agri Products, Inc. ("UAP") for sponsorship of a research project entitled "Development of Crops Tolerant to Treatment with Dicamba," which was to be supervised by Dr. Weeks and Dr. Ragsdale.  (Filing 223-12, at BDR 000667.)

22.     The UAP Agreement required UAP to pay the University $300,000 per year for the research, in exchange for which the University granted to UAP "a fully paid, royalty free, non-exclusive, worldwide license to any inventions patented or developed" under the contract, as well as "the exclusive right of first refusal of an exclusive, worldwide, royalty bearing license to any inventions patented or developed" under the contract.  (Filing 223-12, at BDR 000668-670.)  In January 2005, UAP gave notice to the University that it wished to terminate the contract, relinquish all claims to any patent rights encompassed by the contract, and to execute any documents necessary to "permit the University to license, sell, or assign the PATENT RIGHTS to a third party . . . ."  (Filing 223-14, at BDR 001586.)

23.     On January 12, 2005, the University entered into an agreement with

14

Monsanto Company. (Filing 224-32.) The University/Monsanto Agreement provided in relevant part:

      1.1  University owns certain U.S. and foreign patent applications which have patent claims which would, if issued, cover the making or reproduction of transgenic organisms, including plants, which exhibit resistance to dicamba herbicide.

      1.2  University has previously granted an exclusive license to United Agri-Products, Inc. ("UAP") to the University Patent Rights.

      1.3  Monsanto has separately negotiated with UAP to terminate all of UAP rights to the University Patent Rights.

      1.4  Concurrently with the termination of UAP's rights to the University Patent Rights, Monsanto desires an exclusive license from University to make, use, and sell, genetically engineered plants which might otherwise be an infringement of the Licensed Patent Rights.

    . . . .

      2.4 "Field of Use" means transgenic propagating material, plants, and seeds including but not limited to soybean, cotton and corn.

      2.5 "Licensed Patent Rights" means the University Patent Rights and any Supplemental Patent Rights.

      2.6 "Licensed Products" means materials, including but not limited to, plants and seeds of soybean cotton, and corn, which, in the course of their manufacture, use, or sale would, in the absence of a license, infringe one or more claims of an issued and unexpired U.S. or foreign patent included in the Licensed Patent Rights which have not been finally adjudicated to be invalid by a court of competent jurisdiction.

    . . . .

2.10 "University Patent Rights" means Patent Rights, including but not limited to: U.S. patent applications No. 60/042,941, filed April 4, 1997; U.S. patent application No. 60/042,666, filed April 4, 1997; U.S. patent application No. 09/055,145, filed April 3, 1998; U.S. patent application No. 09/797,238, filed Feb. 28, 2001; U.S. patent application No. 10/330,662, filed December 27, 2002; and all continuations, continuations-in-part, divisional, and reissue applications and patents issuing therefrom and extensions of such patents and all foreign counterpart patent applications thereto and continuation or divisional thereof and any patent issuing therefrom; any reissue or extension of any such foreign patent; any confirmation patent, registration patent or patent of addition based thereon and any related inventor's certificate.

2.11 "Patent Rights" means all U.S. or foreign patent applications or patents owned or licensed (either exclusively or non-exclusively) with the right to grant sublicenses, by University, and which would be infringed by the making, using, reproduction or sale of a transgenic organisms, including plants, which exhibit resistance to or the ability to catabolize dicamba herbicide or exhibit any other attribute or characteristic claimed in such U.S. or foreign patent applications or patents owned or licensed by University.

. . . .

3.1    (a) University grants to Monsanto and its Affiliates the exclusive, world-wide right and license to the Licensed Patent Rights to make, have made, use, have used, sell, have sold, import, have imported, export and have exported Licensed Products in the Field of Use.

(b) University grants to Monsanto and its Affiliates the exclusive, world-wide right and license to University Know-How and University Biological Material to make, have made, use, have used, sell, have sold, import, have imported, export and have exported products in the Field of Use; provided that, (i) to the extent that said University Know-How has a substantial demonstrated use other than dicamba-resistance in the Field of Use then, the license granted herein by the University to Monsanto to make, have made, use, have used, sell, have

16

sold, import, have imported, export and have exported products in the Field of Use under such University Know-How shall be non-exclusive solely for those items of University Know-How that have such substantial demonstrated use other than dicamba-resistance in the Field of Use; and (ii) to the extent that a genetic expression element (other than a dicamba-resistance gene) included in said University Biological Material has a substantial demonstrated use other than for dicamba-resistance in the Field of Use then the license granted herein by the University to Monsanto to make, have made, use, have used, sell, have sold, import, have imported, export and have exported products in the Field of Use under such genetic expression element of University Biological Material shall be non-exclusive solely for those genetic expression element(s) of University Biological Material that have such substantial demonstrated use other than dicamba-resistance in the Field of Use.

(c) The license to any and all germplasm comprising a dicamba-resistance gene shall remain exclusive in all cases. Further, the University shall not transfer any Biological Material, including germplasm, comprising a dicamba-resistance gene to any Third Party without the prior written approval of Monsanto.

3.2 University further grants to Monsanto and its Affiliates the right to sublicense the rights conveyed in subsection 3.1 . . . . To the extent that Monsanto sublicenses any such rights, it shall provide University with a written notice of such sublicenses granted in the prior year in the annual report provided to the University . . . .

. . . .

6.5 If a Determination is made that any Third Party has any right or license under one or more Patent Rights of the University Patent Rights, Monsanto, in addition to any other right which it might have, shall be permitted to reduce by a factor of seventy-five percent (75%) all payments otherwise due pursuant to subsections 4.1 and 4.3. . . .

6.6 If University fails to bring a suit, action or other proceeding [regarding any material infringement of the Licensed Patent Rights in the

Field of Use by a Third Party], then University shall enable Monsanto to bring such a suit, action or proceeding . . . .

. . . .

8.1  University hereby represents and warrants that:

(a)     It is . . . the owner of all right, title and interest in and to the Licensed Patent Rights.

(b)     . . . it has legal power to extend the sole and exclusive rights granted to Monsanto in this Agreement, and . . . it has not made and will not make any commitments to others inconsistent with or in derogation of such rights;

(c)     As of the Effective Date of this Agreement, it has not received any notice from a Third Party claiming an ownership interest in any patent application or patent included within Licensed Patent Rights nor has it received any notice from third parties claiming that the use of any such right infringes the rights of others[.]

(Filing 224-32, at CM/ECF pp. 3-7, 15-16, 20.)

24.     Besides giving the University the right to receive written notice if Monsanto sublicensed its rights to any other party, as stated in section 3.2 above, the University/Monsanto Agreement also gave the University the rights and/or duties to (a) "decide whether to bring a suit, action or other proceeding for infringement" within 90 days of being informed of infringement by Monsanto and the right to "retain any recover or settlement received" from such a suit (*id.* § 6.3); (b) to obtain 20 percent of any damages recovered in infringement suits brought by  Monsanto (*id.* § 6.6(b)); and (c) "diligently prosecute the patent applications . . . .  with the advice and cooperation of Monsanto" and to "maintain any resulting patents" (*id.* § 6.7).  The Agreement also prevented Monsanto from assigning its rights under the license to any entity other than "one of its Affiliates" or "as part of a sale or transfer of substantially its entire business

18

. . . to a successor or assignee, provided that advance written notice is given to the University and the assignee shall agree in writing to assume and be bound by the terms, conditions and obligations of this Agreement" (*id.* § 10.4). (Filing 224-32, at CM/ECF pp. 15-19, 25.)

### **J.**     **This Action**

25.     Prior to execution of the University/Monsanto Agreement, BASF claimed that it possessed a non-exclusive license to technology developed under the 1993 Contract by virtue of an assignment from Sandoz. Accordingly, on November 17, 2004, the University brought this action against BASF in the United States District Court for the District of Nebraska claiming that BASF possessed no such license. (Filing 1.) Approximately three months after the University/Monsanto Agreement was executed, and on April 6, 2005, BASF answered and added several counterclaims, including a counterclaim asserting, for the first time, that it held "title" to the '896 and '724 patents.[13] (Filing 30.) Monsanto Company intervened on May 11, 2006. (Filing 74.) On July 31, 2006, Syngenta Crop Protection, Inc., filed its motion to intervene, also asserting for the first time that it was claiming "title" in the patents as "successor in interest to Sandoz Agro." (Filing 99.) Syngenta intervened on September 6, 2006. (Filing 114.)

## II. THE PARTIES' CLAIMS

The court understands the parties' claims, boiled down to their essence, to be as follows:

_____

[13]This court has previously found that Monsanto first learned of BASF's claim to title in the biotechnology at issue in late August or early September 2005 when Monsanto contacted counsel for the plaintiff and received copies of the pleadings, including BASF's answer and counterclaims. (Filing 108, at CM/ECF p. 7.)

[T]he underlying question in this lawsuit is whether and to what extent the Sandoz Agreement currently serves to grant anyone a license to market or use University-developed dicamba-resistant crop technology, inventions, know-how, and patents. The University and Monsanto claim Monsanto has the exclusive right to use or sell such technology under its agreement with the University, and BASF has no such rights. BASF claims Monsanto cannot hold an exclusive license because it owns a non-exclusive license for the United States and Canada. Syngenta agrees with BASF, but it further claims that depending on the outcome of the University's lawsuit against BASF, at the least it holds a non-exclusive license to sell the University's dicamba-resistant crop technology anywhere in the world except the United States and Canada, and at most, it still owns the worldwide non-exclusive license as originally granted under the 1993 Sandoz Agreement.

(Filing 114, at 4 (Mem. & Order on Syngenta's Mot. Intervene).)

Specifically, the parties request partial summary judgment on the following claims:

**<u>University</u>:**

(1) BASF has no right, title, or interest in the Sandoz Agro/University license because Sandoz Agro had no right to assign or transfer the license to BASF without the University's consent; (2) BASF does not hold "an irrevocable, world-wide, fully paid up, unrestricted, non-exclusive license with the full right to sublicense to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related" thereto, or the Option; (3) Syngenta does not hold an "irrevocable, fully paid up, unrestricted, non-exclusive license, with the full right to sublicense, to make, have made, use or sell outside the United States and Canada any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related" thereto and Syngenta

does not possess all of Sandoz Agro's worldwide contract rights under the Sandoz Agro/University license; and (4) BASF and Syngenta have no right, title, or interest in the non-exclusive license or the Option to an exclusive license that the University granted to Sandoz Agro pursuant to the sponsored research contract between the University and Sandoz Agro.  (Filing 228, Pl.'s Mot. Summ. J. at 2.)

**BASF:**

(1)  Sandoz Agro's assignment of rights under the Sandoz Agro/University Contract to BASF was valid; (2) as a "mere licensee," and not a bona fide purchaser, Monsanto does not have license rights that encumber the patents and patent applications owned or licensed by BASF under the research-sponsorship contract between Sandoz Agro and the University; and (3) Syngenta does not hold rights under the Sandoz Agro/University Contract, nor does it have any rights relating to the patents and know-how arising from research done under that Contract.  (Filing 234, BASF's Mot. Summ. J. (No. 1); Filing 231, BASF's Mot. Summ. J. (No. 2); Filing 236, BASF's Mot. Summ. J. (No. 3).)  BASF states that "it is not seeking the . . . worldwide dicamba *business*—BASF is simply seeking *any assets* that pertains [sic] principally to the U.S. and Canada dicamba business."  (Filing 272, at CM/ECF p. 8 n.6.)

**Monsanto:**

(1)  The patent licenses granted to Sandoz under its 1993 Contract with the University cannot now reside with BASF or Syngenta because the 1993 Contract did not permit assignment of those rights; and (2) Monsanto's 2005 exclusive patent license from the University cannot be voided by BASF and Syngenta's later-asserted ownership claims because Monsanto's exclusive license was acquired for valuable consideration with no notice of those claims.

21

(Filing 225, Br. Supp. Monsanto's Mot. Summ. J. at 1.)

**Syngenta:**

(1)  Syngenta retains an irrevocable, fully paid-up, unrestricted, non-exclusive license, with the full right to sublicense, to make, have made, use or sell outside the United States and Canada any invention, including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related thereto to which the University has any right, title, or interest under section 10 of the 1993 Contract between the University and Sandoz Agro, Inc.; (2) if the court holds invalid the assignment of a portion of Sandoz's rights to BASF, then those rights were retained by Syngenta; (3) Syngenta has an Option to dicamba-resistance technology outside the field of dicamba-resistant crop plants; and (4) Monsanto's license is invalid, and the University should be enjoined from issuing further exclusive licenses that conflict with Syngenta's non-exclusive license.  (Filing 222, Br. Supp. Syngenta's Mot. Partial Summ. J. at 2.)

### III.  DISCUSSION

### A.    The 1993 Contract & 1995 Option

The terms of the 1993 Contract between the University and Sandoz Agro state that the Contract is to be interpreted using Nebraska law.  Under Nebraska law, a court interpreting a contract must first determine whether the contract is ambiguous. *Hillabrand v. American Family Mut. Ins. Co.*, 713 N.W.2d 494, 498 (Neb. 2006).  "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Id.* "When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them."  *Id.*; *Gary's Implement, Inc.*

22

*v. Bridgeport Tractor Parts, Inc.*, 702 N.W.2d 355, 366 (Neb. 2005) ("A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.")  The fact that parties to a dispute suggest opposing interpretations of contractual language "does not necessarily, or by itself, compel a conclusion that the document is ambiguous." *Kluver v. Deaver*, 714 N.W.2d 1, 6 (Neb. 2006).

I find that the language of the 1993 Contract and 1995 Option relevant to this dispute is not ambiguous, and is therefore not subject to interpretation using the rules of construction.  The plain language of section 10 of the 1993 Contract gave to the University *title* to know-how, inventions, and patents made solely by University personnel[14] from research performed under the Contract—that is, the development of crops tolerant to the Sandoz herbicide, dicamba.  The Contract also gave Sandoz Agro a "world-wide,[15] . . . unrestricted, non-exclusive *license* with the full right to sublicense to make, . . . use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba . . . ."  (Filing 224-2, at CM/ECF pp. 1-6 § 10 (emphasis added).)

In addition to the non-exclusive license granted to Sandoz Agro in the 1993 Contract, the 1995 Option gave Sandoz "the option to a corresponding worldwide exclusive royalty bearing license to the same subject matter outside the field of dicamba resistant crop plants," with the royalty rate to be further negotiated by the parties. (Filing 224-4.) The question then becomes whether Sandoz Agro could assign to BASF its non-exclusive patent license pursuant to the 1996 Asset Purchase

---

[14]The only specific know-how, invention, or patent identified in this lawsuit are the '896 and '724 patents which, on their face, were invented solely by University personnel and are assigned to the Board of Regents of the University of Nebraska.

[15]Note that the Contract explicitly defined the geographic scope of the non-exclusive license given to Sandoz Agro as "world-wide."

23

Agreement between Sandoz Ltd. and BASF.

### B.    Assignment of Sandoz Agro's Non-Exclusive License to BASF

"The long[-]standing federal rule of law with respect to the assignability of patent license agreements provides that these agreements are personal to the licensee and not assignable unless expressly made so in the agreement."  *Unarco Indus., Inc. v. Kelley Co., Inc.*, 465 F.2d 1303, 1306 (7th Cir. 1972) (suit for declaratory relief seeking proper construction of written agreement granting non-exclusive patent license; issue was whether patent license was assignable without consent of licensor) (citing *Troy Iron & Nail Factory v. Corning*, 55 (14 How.) U.S. 193 (1852); *Hapgood v. Hewitt*, 119 U.S. 226 (1886); *Lane & Bodley Co. v. Locke*, 150 U.S. 193 (1893); *Walter A. Wood Harvester Co. v. Minneapolis-Esterly Harvester Co.*, 61 F. 256 (D. Minn. 1894); *Bowers v. Lake Superior Contracting & Dredging Co.*, 149 F. 983 (8th Cir. 1906)).  *See also* 6 *Lipscomb's Walker on Patents* § 20:29, at 106 (3d ed. 1987 & 2007 Supp.) (general rule is that agreements granting patent licenses are personal and unassignable unless expressly made so; patent license agreement may not be assigned without consent of patent owner).

This rule against free assignability of patent licenses absent consent has been "unquestioned" in post-*Erie*[16] federal decisions and has been "adhered to by state and federal courts."  *Unarco*, 465 F.2d at 1306-07 (footnote omitted).  *See Rone Poulenc Agro, S.A. v. DeKalb Genetics* Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002) (many courts have concluded that federal law must be applied to question of transferability of patent licenses); *In re CFCL, Inc.*, 89 F.3d 673, 677 (9th Cir. 1996) (considering *Erie* and finding that federal law governed question of assignability of patent licenses because conflict existed between federal patent policy of rewarding invention with exclusive use for period of years and state law that would allow free assignability);

---

[16]*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

24

*Gilson v. Republic of Ireland*, 787 F.2d 655, 658 (D.C. Cir. 1986) (non-exclusive licensee of patent has personal, not property, interest in the patent, and such personal right cannot be assigned unless patent owner authorizes assignment or license itself permits assignment); *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093-94 (6th Cir. 1979) (the law treats a patent license as if it contained restrictions of non-assignability and non-transferability in the absence of express provisions to the contrary); *Rock-Ola Mfg. Corp. v. Filben Mfg. Co.*, 168 F.2d 919, 921-22 (8th Cir. 1948) (mere granting of license to make, use, or sell patented article does not confer upon licensee right to transfer license unless patentee has consented).[17]

As aptly stated by one court:

Allowing free assignability—or, more accurately, allowing states to allow free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents. And while the patent holder could presumably control the absolute number of licenses in existence under a free-assignability regime, it would lose the

---

[17]*But see Superbrace, Inc. v. Tidwell*, 21 Cal. Rptr. 3d 404, 414 (Cal. App. 4th Dist. 2004) (choosing to apply state common law of free assignability of patents, rather than contrary federal law, in determining whether patent license was assignable). Carole A. Quinn & R. Scott Weide, *Violation of the Erie Doctrine: Application of a Rule of Federal Common Law to Issues of Patent License Transferability*, 32 Creighton L. Rev. 1121 (1999) (maintaining that applying rule of federal common law to issues of patent license transferability violates *Erie* doctrine; noting that federal courts have uniformly applied rule of federal common law to questions of patent license transferability and that most federal courts addressing patent license transferability post-*Erie* have failed to mention *Erie*, but "[t]hose few courts which have addressed *Erie* [in patent license transferability cases] have concluded that application of a rule of federal common law is warranted").

very important ability to control the identity of its licensees. Thus, any license a patent holder granted—even to the smallest firm in the product market most remote from its own—would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to license. As a practical matter, free assignability of patent licenses might spell the end to paid-up licenses such as the one involved in this case. Few patent holders would be willing to grant a license in return for a one-time lump-sum payment, rather than for per-use royalties, if the license could be assigned to a completely different company which might make far greater use of the patented invention than could the original licensee.

*In re CFLC, Inc.*, 89 F.3d at 679.

Because assignability of patent license agreements concerns "a specific policy of federal patent law" described above by the *In re CFLC* court, and following the clear majority of courts that have spoken on the issue, I shall apply federal law to the question of assignability of Sandoz Agro's non-exclusive license in this case. Accordingly, I conclude that Sandoz Agro's non-exclusive license granted by the 1993 Contract and 1995 Option was not assignable to BASF unless the University authorized the assignment or the license itself permitted assignment.[18]

While the 1993 Contract gave Sandoz Agro the right to *sublicense* its rights, the agreement contained no language that expressly permitted Sandoz Agro to *assign* its non-exclusive license without the University's consent. A contractual "right to

---

[18]While BASF and Syngenta make much of the fact that there was no patent or patent application in existence when the Contract and Option granted Sandoz Agro its non-exclusive license, "[a] license is valid, if made before the patent is issued, as well as if made afterward." 6 *Lipscomb's Walker on Patents* § 20:21, at 77 (3d ed. 1987 & 2007 Supp.). Further, "[v]alid contracts may be made to grant licenses under future inventions." *Id.* § 20:53, at 174.

sublicense does not establish as a matter of law an intent to also allow [a corporation] to assign its rights." *Verson Corp. v. Verson Intern. Group PLC*, 899 F. Supp. 358, 363 (N.D. Ill. 1995) (finding that party improperly sought "to bootstrap its negotiated right to sublicense into a right to assign"). Further, there is no evidence that the University authorized or consented to assignment of the non-exclusive license by Sandoz Agro to BASF separate and apart from the 1993 Contract.

Therefore, Sandoz Agro's "irrevocable, world-wide, fully paid up, unrestricted, non-exclusive license with the full right to sublicense to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba" was personal and not assignable by Sandoz Agro to BASF. Thus, Sandoz Agro's license was not transferred to BASF under the Asset Purchase Agreement between Sandoz Ltd. and BASF because the Agreement transferred only Sandoz's "*assignable* rights and obligations contained in contracts, leases, licenses" pertaining principally to Sandoz Ltd.'s and its subsidiaries' "agricultural dicamba business in the United States and Canada," including "all United States and Canada . . . licenses, agreements . . . held or used by [Sandoz] in connection with . . . the operation of the Dicamba Business, *to the extent transferable . . . .*" (Filing 224-9, Asset Purchase Agreement, at SCPI 004179; Filing 224-16, List of Assets, at SCPI 005274-005276 (emphasis added).) Similar language was used in the subsequent Bill of Sale and Assignment, which sold, assigned, and transferred to BASF "[Sandoz's] *assignable* rights and obligations contained in the contracts, . . . licenses . . . pertaining principally to the Business," which again was defined as Sandoz's "agricultural dicamba business in the United States and Canada." (Filing 224-18, at SCPI 004374-004377 (emphasis added).) *See Coppola v. Stroker*, 653 N.Y.S.2d 134, 135 (N.Y. App. Div., 2nd Dept. 1997) (principles of contract construction under New York law require that plain language must be given effect and every provision should be deemed to have some meaning). *See also* 6 *Lipscomb's Walker on Patents* § 20:29, at 113 (3d ed. 1987 & 2007 Supp.) ("An assignment of a license without the patentee's or licensor's consent has been held voidable . . . .").

27

Accordingly, I shall grant the University's motion for partial summary judgment insofar as it claims that BASF has no right, title, or interest in the Sandoz Agro/University non-exclusive license or the 1995 Option because Sandoz Agro had no right to assign or transfer the license to BASF without the University's consent.

## C.    Syngenta's Rights

Syngenta claims that it obtained Sandoz Agro's non-exclusive license  granted under the 1993 Contract not by a prohibited assignment, but because either (1) Syngenta merged with Sandoz Agro or (2) Syngenta can be considered Sandoz Agro's "affiliate" for purposes of the 1993 Contract and 1995 Option.[19]

### 1.    Sandoz Agro/Syngenta Merger

Effective December 21, 2005, Sandoz Agro, Inc., merged with and into Syngenta Crop Protection, Inc.  The Certificate of Ownership and Merger stated that Syngenta owned "all of the outstanding capital stock of Sandoz Agro, Inc.," and "assume[d] all of the obligations of Sandoz Agro."  The Certificate of Merger referred to Syngenta as "the surviving corporation."   (Filings 224-30, 223-20, 223-21.)  Syngenta argues that the transfer of a patent license through corporate merger is somehow different, for purposes of federal patent law, than a transfer by assignment.

In *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090 (6th Cir. 1979), PPG Industries, Inc., had given a non-exclusive patent license to a company called Permaglass, Inc.  Five years after the license was given, Permaglass merged into a

---

[19]The 1995 Option expressly applies only to "SANDOZ" and does not include "affiliate companies," as the 1993 Contract did.  However, Syngenta argues that because the Option was simply an amendment to the 1993 Contract, and because the 1993 Contract included Sandoz's "affiliates," the "affiliate" issue also exists with regard to the Option.

company called Guardian Industries Corp.  The question in *PPG* was whether Guardian, as "the surviving or resultant corporation in a statutory merger," had acquired the patent rights of Permaglass.  *Id.* at 1091.  In support of its claim that it held the patent rights, Guardian argued, and the district court held, that the patent license had vested by operation of law and had not been impermissibly transferred or assigned.  *Id.* at 1093.

The Sixth Circuit rejected Guardian's argument and the holding of the district court.  In reaching its holding, the court distinguished cases involving "shop rights"[20] and rights under real estate leases, both of which are allowed to pass in statutory mergers.  *Id.* at 1094-95.  In particular, the court explained that decisions allowing real estate leases to pass by merger are explained by "the deep-rooted policy against restraints on alienation."  *Id.* at 1095.  The court noted that there "is no similar policy which is offended by the decision of a patent owner to make a license under his patent personal to the licensee, and non-assignable and non-transferable."  *Id.*  "In fact," the court noted, "the law treats a [patent] license as if it contained these restrictions in the absence of express provisions to the contrary."  *Id.*  The court added:

> If the parties had intended an exception in the event of a merger, it would have been a simple matter to have so provided in the agreement. . . . We conclude that if the parties had intended an exception in case of a merger to the provisions against assignment and transfer they would have included it in the agreement.

*Id.  See also* 6 *Lipscomb's Walker on Patents* § 20:58, at 203 ("The court will not read limitations into the agreement which could have been readily inserted by the parties; it is not the function of the court to redraft the agreement but to interpret that which the

---

[20]"A shop right is an implied license which accrues to an employer in cases where an employee has perfected a patentable device while working for the employer.  Though the employee is the owner of the patent[,] he is estopped from claiming infringement by the employer."  *Id.* at 1094.

parties have agreed to in writing.").

The court then turned to Guardian's theory of "continuity"—"that the patent licenses . . . were not transferred because they passed by operation of law." *Id.* In addressing this issue, the court considered not only the Ohio merger statute, but also the Delaware statute, on which Syngenta now relies. *Id.* at 1096. The Delaware statute provided, as it does now, that the property of constituent corporations "shall be vested in the corporation surviving or resulting from such merger or consolidation." *Id.* (citing 8 Del. C. § 259). The *PPG* court concluded that a prohibited transfer "is no less a transfer because it takes place by operation of law rather than by a particular act of the parties." *Id.* at 1096.

The *PPG* case has been followed by other federal district courts. *See SQL Solutions, Inc. v. Oracle Corp.*, No. C-91-1079 MHP, 1991 WL 626458, at *3-4 (N.D. Cal. Dec. 18, 1991) (holding that non-assignable and non-transferrable software license could not be transferred by way of merger); *Pro-Edge, L.P. v. Gue*, 419 F. Supp. 2d 1064, 1070-74, 1083-85 (N.D. Iowa 2006) (explicitly adopting the *PPG* approach and finding employment agreement not permitted to be transferred in series of corporate transactions which revamped employer's corporate structure); *Cincom Sys., Inc. v. Novelis Corp.*, No. 1:05CV152, 2007 WL 128999, at *1, 3-5 (S.D. Ohio Jan. 12, 2007) (expressly adopting *PPG* and holding that non-transferrable software license could not be passed to corporate affiliates of licensee through series of mergers; stating that court "cannot ignore federal law and policy supporting the non-assignability of intellectual property rights").

Federal law has established a clear rule that patent licenses are not assignable without express permission by the licensor. This rule permits both a patent licensor and its licensee to know precisely how that license may be used in the future. This purpose would not be served by reading into the 1993 Contract a "merger" exception not negotiated by the parties and not contained in the words of the agreement.

Therefore, Syngenta did not acquire Sandoz Agro's license rights under the 1993 Agreement and 1995 Option by virtue of its subsequent merger with Sandoz Agro.

### 2.   Syngenta as Affiliate of Sandoz Agro

The 1993 Contract was between the University and Sandoz Agro "and its [a]ffiliated companies," a term that was not defined by the Contract and is, therefore, ambiguous.  The evidence presented by the parties and described in section I of this memorandum creates a genuine issue of fact as to whether the parties intended "[a]ffiliated companies" to encompass current, future, or current *and* future affiliates of Sandoz Agro.[21]  Under such circumstances, summary judgment is not appropriate. *See Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 506 N.W.2d 706, 353-54 (Neb. 1993) (ambiguity in contract exists when word is susceptible of at least two reasonable but conflicting interpretations or meanings; summary judgment not appropriate when contract language was ambiguous because term was not defined and "a factual question exist[ed] regarding the nature of the contractual obligation" undertaken by the parties).  *See also GTE Wireless, Inc. v. Cellexis Int'l, Inc.*, 341 F.3d 1 (1st Cir. 2003) (fact issue existed as to whether settlement agreement reached entities that became affiliates of plaintiff after execution of agreement); *GTE Mobilnet Svc.*

---

[21]The University argues that whether Syngenta and Sandoz Agro were affiliates *at the time the 1993 Contract was executed* is the relevant question.  *See, e.g., Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 2003 WL 21801022, at *4 (N.D. Ill. Aug. 4, 2003) (discussing numerous definitions of "affiliate" and analyzing whether two corporations were affiliates "at the time the Commutation Agreement was executed").  Syngenta admits that, under that standard, it did not exist and was not an "affiliate" of Sandoz Agro when the University and Sandoz Agro entered into their 1993 Contract.  (Filing 246, Syngenta's Br. Opp'n Univ.'s Mot. Summ. J. at CM/ECF pp. 4-5.)  However, Syngenta argues that because the contract does not contain a temporal limitation on "[a]ffiliated companies," that term was meant to encompass entities which became affiliated with Sandoz Agro *after* the 1993 Contract was executed.  (*Id.* at CM/ECF p. 20.)

31

*Corp. v. Cellexis Intern., Inc.*, 2004 WL 848172, at *1 (D. Mass. Apr. 20, 2004) (question of whether parties intended term "affiliates" to mean entities that were such at time agreement was executed or whether term included future affiliates was question for fact-finder).

Accordingly, I shall not grant summary judgment in favor of any party on this claim.

### D.   Monsanto's License

In January 2005, the University entered into a license agreement with Monsanto for the dicamba-resistance crop research being performed at the University. Under the agreement, the University granted Monsanto an exclusive, world-wide right and license to the University's patent rights, including several patent applications and any U.S. patents issuing therefrom, such as the Weeks patents discussed above.

As the holder of legal title to the Weeks patents, the University had the right to exclusively license those patents to others. 35 U.S.C. § 261 ("The . . . patentee . . . may . . . grant and convey an exclusive right under his . . . patents . . . ."); 6 *Lipscomb's Walker on Patents* § 20:2, at 4 ("The patent owner may grant an exclusive license or grant nonexclusive licenses to many."), § 20:4, at 13-14 ("Only the owner or one who has an interest in the legal title to the invention covered by the license can grant a license.").

However, as explained above, summary judgment must be denied on the issue of whether Syngenta, as Sandoz Agro's possible "affiliate," is entitled to a non-exclusive license under the 1993 Contract. Therefore, summary judgment must also be denied on the issue of whether Syngenta or Monsanto took their patent licenses (to

the extent Syngenta has a patent license) subject to any preexisting licenses.[22]

## IV.  CONCLUSION

For clarity, I shall specifically indicate in bold capital letters below my ruling on each part of each party's motions for partial summary judgment:

**University's Motion (Filing 228):**

(1)  BASF has no right, title, or interest in the Sandoz Agro/University license because Sandoz Agro had no right to assign or transfer the license to BASF without the University's consent (**GRANTED**); (2) BASF does not hold "an irrevocable, world-wide, fully paid up, unrestricted, non-exclusive license with the full right to sublicense to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related" thereto, or the Option (**GRANTED**); (3) Syngenta does not hold an "irrevocable, fully paid up, unrestricted, non-exclusive license, with the full right to sublicense, to make, have made, use or sell outside the United States and Canada any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related" thereto and Syngenta does not possess all of Sandoz Agro's worldwide contract rights under the Sandoz Agro/University license (**DENIED**); and (4) BASF (**GRANTED**) and Syngenta (**DENIED**) have no right, title, or interest in the non-exclusive license or the Option to an exclusive license that the University granted to Sandoz Agro pursuant to the sponsored research contract between the University and Sandoz Agro.  (Filing 228, Pl.'s Mot. Summ. J. at 2.)

---

[22]The issue of the geographic scope of Syngenta's license, if it has one, also remains to be determined.

**BASF's Motions (Filings 231, 234, 236):**

(1)  Sandoz Agro's assignment of rights under the Sandoz Agro/University Contract to BASF was valid **(DENIED)**; (2) as a "mere licensee," and not a bona fide purchaser, Monsanto does not have license rights that encumber the patents and patent applications owned or licensed by BASF under the research-sponsorship contract between Sandoz Agro and the University **(DENIED)**; and (3) Syngenta does not hold rights under the Sandoz Agro/University Contract, nor does it have any rights relating to the patents and know-how arising from research done under that Contract **(DENIED)**.

**Monsanto's Motions (Filings 220, 221):**

(1)  The patent licenses granted to Sandoz under its 1993 Contract with the University cannot now reside with BASF **(GRANTED)** or Syngenta **(DENIED)** because the 1993 Contract did not permit assignment of those rights; and (2) Monsanto's 2005 exclusive patent license from the University cannot be voided by BASF **(GRANTED)** and Syngenta's **(DENIED)** later-asserted ownership claims because Monsanto's exclusive license was acquired for valuable consideration with no notice of those claims.

**Syngenta's Motion (Filing 219):**

(1)  Syngenta retains an irrevocable, fully paid-up, unrestricted, non-exclusive license, with the full right to sublicense, to make, have made, use or sell outside the United States and Canada any invention, including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related thereto to which the University has any right, title, or interest under section 10 of the 1993 Contract between the University and Sandoz Agro, Inc. **(DENIED)**; (2) if the court holds invalid the assignment of a portion of Sandoz's rights to

34

BASF, then those rights were retained by Syngenta (**DENIED**); (3) Syngenta has an Option to dicamba-resistance technology outside the field of dicamba-resistant crop plants (**DENIED**); and (4) Monsanto's license is invalid, and the University should be enjoined from issuing further exclusive licenses that conflict with Syngenta's non-exclusive license (**DENIED**).

IT IS ORDERED:

1.    The motion for partial summary judgment filed by plaintiff Board of Regents of the University of Nebraska (filing 228) is granted in part and denied in part;

2.    The motions for partial summary judgment filed by defendant BASF Corporation (filings 231, 234, 236) are denied;

3.    The motion for partial summary judgment filed by intervening plaintiff Monsanto Company against defendant BASF Corporation (filing 220) is granted;

4.    The motion for partial summary judgment filed by intervening plaintiff Monsanto Company against intervening defendant Syngenta Crop Protection, Inc., (filing 221) is denied;

5.    The motion for partial summary judgment filed by intervening defendant Syngenta Crop Protection, Inc., (filing 219) is denied.

November 6, 2007.                    BY THE COURT:
                                     s/ *Richard G. Kopf*
                                     United States District Judge